In the Matter of the Application of THE DIAMOND STATE TELE-
PHONE COMPANY for Changes in Rates in Accordance with
Section 151 of Title 26 of the *Delaware Code of* 1953.

318

320

(*February* 19, 1954.)

LAYTON, J., sitting.

*William S. Potter* and *Richard F. Corroon* for The Diamond State Telephone Company; *John B. King* and *Paul Maloney* (of Philadelphia, Pa.) of Counsel.

*Max Terry, James J. Walsh,* and *Richard W. Case* (of Baltimore, Md.) for the Public Service Commission of Delaware.

Superior Court for New Castle County, No. 937, C. A. 1953.

LAYTON, J.:

This appeal draws into question not only the action of the Commission in denying a substantial portion of the rate increase sought by the Company, but, also, for the first time, a major interpretation of the Public Service Commission Act, Title 26, Sections 101 *et seq.* of the *Delaware Code of* 1953. The decision of the Commission is very brief. It contains few findings of fact and is devoid of reasons in support of the conclusions arrived at. Inasmuch as the facts were all furnished by the Company and few, if any, are in dispute, in the interest of expediency, I shall make certain basic findings and, from time to time, others as the occasion may arise.

## Findings of Fact

The Company is a wholly owned subsidiary of American Telephone and Telegraph Company and operates in Delaware exclusively except to the extent that calls originating in Delaware may be transmitted everywhere throughout the American Telephone & Telegraph system. The only increase in the level of its rates in Delaware since 1921 was one established in 1949 on a state-wide basis as the result of an increase for the City of Wilmington authorized by the old Board of Public Utility Commissioners of the City of Wilmington. On several occasions during the same period, rate reductions were voluntarily effected by the Company. Since the beginning of World War II, the demand for telephone service has increased at an unprecedented rate. The number of telephones in Delaware has just about doubled since 1945, and the number of telephone calls made has increased over 70%. On July 1, 1953, the Company had 2172 unfilled orders for telephone service and 6826 unfilled orders for higher grades of service. Because of the sustained demand for service, the Company plans to make net additions to its plant of $10,800,000 (1953 through 1955) in order to take care of unfilled orders.[2] Businesses other than utilities may choose the time

---

[2]About $2,500,000 has already been spent.

for expansion but a telephone company must provide facilities where and when the demands for service arise.

Inflation has had a severe effect on all phases of the national economy but its impact has been particularly heavy on utilities which, being subject to regulation, are not free arbitrarily to increase their rates in order to keep abreast of rising costs. Thus, since the end of 1948, the level of the Company's expenses and taxes has risen at a faster rate than revenues. As of April 30, 1953, the level of intra-state operating expenses and taxes was 57% higher than at the end of 1948, while during this same period, intra-state revenues were only slightly in excess of 46% higher, with the result that, despite an increase of $8,500,000 in intra-state plant investment, there was no increase in net income. This has caused the Company's rate of return materially to decline.

Since 1940, the Consumer Price Index[3] indicates that the cost of living has increased 89% but, actually, most of the things with which the average man is familiar and uses constantly have increased at least 100%. Thus, labor costs have more than doubled, Federal income taxes have increased 117%, and the price of automobiles has increased 150% or more depending on make. During this same period, intra-state telephone rates in Delaware have increased but 18% and if the full increase requested in this proceeding had been granted, the total increase in such telephone rates since 1940 would have amounted to 38%. The increase in rates actually granted by this Commission together with that allowed in May, 1949, amounted to a total rate increase since 1940 of about 24½%. The proposed rates, if granted in full, would increase monthly telephone charges by about 85 cents per average resident customer, and by about $4.54 per average business customer. Even if the proposed rates had been granted in full as of August 1953, the Company would have had to reduce its surplus by $27,000 to pay its long established $2 annual common stock dividend for

[3]United States Department of Labor.

1953; and in 1954-1955, it would have been able merely to maintain its dividend and add to surplus a sum less than the amount required for one quarterly dividend payment. A number of years ago, the Company sold $3,000,000 of debentures to a group of insurance companies. Except for these debentures, all external financing of the Company has been effected through the parent, American Telephone & Telegraph Company.

### Basic Contentions of the Company
### and of the Commission

The proposed rates here in dispute were designed to produce for the Company additional annual gross revenues of about $1,514,000, which, after taxes, would amount to $717,600 of additional net income. The Commission directed reduction in the proposed rates so that the Company would receive an increase in gross income of only $517,000 before taxes. The Company contended that the rate base[4] should be approximately $28,700,-000, while the Commission found that the rate base was $22,000,000. The Company based its case for a rate base primarily on reproduction cost less depreciation. The Commission in its determination of the Company's rate base apparently added 12% weight to original book cost depreciated to allow for reproduction cost of plant.[5] It accepted a version of the Company's probable earnings based upon former rates as sharply revised by its own expert witness.

Basically then, the bones of contention are these:

(1) The Commission disallowed over $380,000 of cash working capital as a part of the Company's rate base.

(2) The Commission erred in accepting its own expert's estimate of allowable net earnings which contained the following errors, all of which exceeded the bounds of reasonable discretion and resulted in overstating the Company's net earnings by:

---

[4]Present fair value of the Company's entire intra-state plant.

[5]This is the equivalent of about a 10.15% weighting for reproduction cost based on the $22,000,000, rate base.

(a) Using the year ended April 30, 1953 as a test period.

(b) Failing to reflect the full annual amount of expense due to wage increases incurred during the test period.

(c) Crediting earnings with a non-recurring income tax credit applicable to a prior year.

(d) Refusing to include charitable contributions made by the Company during the test period.

(e) Fictitiously increasing the Company's debt ratio and thereby reducing fictitiously, the Company's Federal tax liability.

(3) In any event, because of the 90% increase in the cost of living since 1940, the Commission erred as a matter of law in not giving substantially greater weight to the fair value of the Company's plant as depicted by its study of reproduction cost less depreciation.

### History of Fair Value

It is a legal maxim extending far back into the common law of England that he who devotes his property to the public use does so charged with full notice that it may be subject to governmental regulation[6] both as to the manner in which it is used and the compensation which is obtained from it. 73 *C. J. S.*, Public Utilities, § 10. The form of regulation which has taken place in this country is by State or Federal Public Utility Commissions, which, in general, have been authorized to determine just and reasonable rates based upon either the original cost of, or the fair value of the utility property.[7]

Inasmuch as one of the important questions for decision here is whether or not Title 26 of the 1953 *Code* is a fair

---

[6]See *Munn v. Illinois,* 94 *U. S.* 113, 24 *L. Ed.* 77, in which this principle is discussed and a number of English cases forming its bases are examined.

[7]This is not true of the Federal Courts since the advent of *Federal Power Commission v. Hope Natural Gas Co.,* 1944, 320 *U. S.* 591, 64 *S. Ct.* 281, 88 *L. Ed.* 333.

value statute, some understanding of the term must be had. Fair value began with *Smyth v. Ames,* 1899, 169 *U. S.* 466, 18 *S. Ct* 418, 42 *L. Ed.* 819. Prior to 1899, a few states had Public Service Commission Statutes which, in essence, authorized the Commissions to fix just and reasonable rates. But the concept of constitutional law prohibiting as confiscatory the fixing of rates which would yield less than a fair return on the fair value of the utility property was as yet unknown. The argument was advanced before the Supreme Court in *Munn v. Illinois,* 94 *U. S.* 113, and other decisions but was rejected upon the theory that the Fourteenth Amendment prohibited only confiscation of physical assets or title to property itself.[8] Gradually, the Court shifted its position, at first intimating that rates might be violative of the Fourteenth Amendment if outrageously low and then, finally, in *Smyth v. Ames,* taking its stand squarely upon the proposition that the due process provisions of the Constitution required that rates be fixed at levels which would insure the yielding of a fair return on the fair value of the utility property. Oddly enough, this pronouncement was purely dictum, which I quote [169 *U. S.* 466, 18 *S. Ct.* 434]:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case."

---

[8]"For protection from abuse from legislatures the people must resort to the polls not the Courts." *Munn v. Illinois, supra.*

Thus began the era of fair value which despite the criticisms from economists[9] and the rising dissents from within the Court itself, dissent of Holmes and Brandeis in *Southwestern Bell Telephone Co. v. Public Service Commission*, 262 *U. S.* 276, 43 *S. Ct.* 544, 67 *L. Ed.* 981,[10] was to be the Federal law for nearly 50 years. Many economists confessed that they knew only one kind of value, market value based on the present and probable future earnings of the property and that present fair value was an illusory thing. Nevertheless, the Supreme Court wrote opinion after opinion hewing to the fair value theory of rate-making. Thus, in *San Diego Land & Town Co. v. Jasper*, 189 *U. S.* 439, 23 *S. Ct.* 571, 572, 47 *L. Ed.* 892, the Court, speaking through Justice Holmes, decided that present value, not original cost, was the proper basis for rate-making:

"The main object of attack is the valuation of the plant. It no longer is open to dispute that under the Constitution 'what the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' *San Diego Land & Town Co. v. National City*, 174 *U. S.* 739, 757, 19 *S. Ct.* 804, 811, 43 *L. Ed.* 1154, 1161. That is decided, and is decided as against the contention that you are to take the actual cost of the plant, annual depreciation, etc., and to allow a fair profit on that footing over and above expenses."

And as late as 1933, we see Chief Justice Hughes stating in *Los Angeles Gas & Electric Corporation v. R. R. Comm.*, 289 *U. S.* 287, 53 *S. Ct.* 637, 644, 77 *L. Ed.* 1180:

"As the property remains in the ownership of the complainant, the question is whether the complainant has been deprived of a fair return for the service rendered to the public in the use of the property. This court has repeatedly held that the basis

---

[9]Bonbright, *Valuation of Property*, Vol. 2, PPS 1078-1165 gives an excellent, brief account of this period.

[10]In this case, the two Justices concurred in the result but dissented as to the means of arriving thereat.

of calculation is the fair value of the property; that is, that what the complainant is entitled to demand, in order that it may have 'just compensation' is 'a fair return upon the reasonable value of the property at the time it is being used for the public.' "

Despite the criticisms of the fair value doctrine, the law was clear enough, but how to apply it was the never-ending problem. Where there had been little change in price levels over long periods of time, it was relatively easy to apply a formula of original cost of the property depreciated.[11] But the difficulty arose as the result of the sharp rise in price levels following World War I. In a series of decisions beginning in 1923 and extending into 1926, the Supreme Court demonstrated an acute awareness of the problem and gave more and more weight to reproduction cost of the property depreciated as the fairest indication of present fair value in cases where economic levels had very substantially risen. Thus, in *McCardle v. Indianapolis Water Co.*, 272 *U. S.* 400, 47 *S. Ct.* 144, 148, 71 *L. Ed* 316, that Court took occasion to state:

"It is well established that values of utility properties fluctuate, and that owners must bear the decline and are entitled to the increase. The decision of this court in *Smyth v. Ames*, 169 *U. S.* 466, 547, 18 *S. Ct.* 418, 434, 42 *L. Ed.* 819, declares that to ascertain value 'the present as compared with the original cost of construction' are, among other things, matters for consideration. But this does not mean that the original cost or the present cost or some figure arbitrarily chosen between these two is to be taken as the measure. The weight to be given to such cost figures and other items or classes of evidence is to be determined in the light of the facts of the case in hand. By far the greater

---

[11]"Undoubtedly, the reasonable cost of a system of waterworks, well-planned and efficient for the public service, is good evidence of its value at the time of construction. And such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices." *McCardle v. Indianapolis Water Co.*, 272 *U. S.* 400, 411, 47 *S. Ct.* 144, 148.

part of the company's land and plant was acquired and constructed long before the war. The present value of the land is much greater than its cost; and the present cost of construction of those parts of the plant is much more than their reasonable original cost. In fact, prices and values have so changed that the amount paid for land in the early years of the enterprise and the cost of plant elements constructed prior to the great rise of prices due to the war do not constitute any real indication of their value at the present time.[12] * * *."

In *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 *U. S.* 276, 43 *S. Ct.* 544, 546, 67 *L. Ed.* 981, the Court in reversing a judgment of the Missouri Supreme Court affirming a Commission order reducing telephone rates in 1919, said this:

"Obviously, the commission undertook to value the property without according any weight to the greatly enhanced costs of material, labor, supplies, etc., over those prevailing in 1913, 1914, and 1916. As a matter of common knowledge, these increases were large. Competent witnesses estimated them as 45 to 50 per centum.

\* \* \* \* \* \*

"It is impossible to ascertain what will amount to a fair return upon properties devoted to public service, without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values, made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded such a forecast becomes impossible. Estimates for to-morrow cannot ignore prices of to-day.

"Witnesses for the company asserted—and there was no substantial evidence to the contrary—that excluding cost of es-

[12]The Court affirmed a decree of a lower Court which had reversed the Commission by increasing the fair value of the Company plant by more than $3,000,000.

tablishing the business, the property was worth at least 25 per cent. more than the commission's estimates, and we think the proof shows that, for the purposes of the present case, the valuation should be at least $25,000,000."

And, in *Bluefield Water Works & Improvement Co., v. Public S. C.*, 262 *U. S.* 679, 43 *S. Ct.* 675, 67 *L. Ed.* 1176, the Court reversed a decree of the West Virginia Supreme Court, 89 *W. Va.* 736, 110 *S. E.* 205, dismissing a petition to set aside an order of the Public Service Commission prescribing water rates which the Company claimed were inadequate and confiscatory. The Court said [ 262 *U. S.* 679, 43 *S. Ct.* 677]:

"The record clearly shows that the commission, in arriving at its final figure, did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous.

* * * * * *

"It is clear that the court also failed to give proper consideration to the higher cost of construction in 1920 over that in 1915 and before the war, and failed to give weight to cost of reproduction less depreciation on the basis of 1920 prices, or to the testimony of the company's valuation engineer, based on present and past costs of construction, that the property in his opinion, was worth $900,000. The final figure, $460,000, was arrived at substantially on the basis of actual cost, less depreciation, plus 10 per cent. for going value and $10,000 for working capital. This resulted in a valuation considerably and materially less than would have been reached by a fair and just consideration of all the facts. The valuation cannot be sustained. * * *"

The doctrine of fair value enjoyed an increasingly uneasy reign in the Federal Courts until 1944, when *Federal Power Commission v. Hope Natural Gas Co.*, 320 *U. S.* 591, 64 *S. Ct.*

281, 287, 88 *L. Ed.* 333, sounded its death knell. Justice Douglas, speaking for the majority, held in effect that so long as the rates were just and reasonable, the requirements of due process had been satisfied:

"Rate-making is indeed but one species of price-fixing. (Cit.) The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. (Cit.) It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

"We held in *Federal Power Commission v. Natural Gas Pipeline Co., supra,* [315 *U. S.* 575, 62 *S. Ct.* 736, 86 *L. Ed.* 1037], that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' (Cit.) And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. (Cit.) Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. (Cit.) It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

The doctrine of fair value was at an end as far as the Federal Courts were concerned. But as Justice Jackson remarked in dissenting:

"We need not be slaves to a formula but unless we can point out a rational way of reaching our conclusions they can only be accepted as resting on intuition or predilection. I must admit that I possess no instinct by which to know the 'reasonable' from the 'unreasonable' in prices and must seek some conscious design for decision.

"The Court sustains this order as reasonable, but what makes it so or what could possibly make it otherwise, I cannot learn. * * *"

During this same period, many states had established Public Service Commissions. Some were, and still are, referred to as "original cost" states because their statutes have been construed to mean that rate bases must be determined upon the basis of original cost. Others, reflecting the influence of *Smyth v. Ames,* incorporated in their statutes substantially the famous dictum contained in that case quoted above and are commonly called "fair value" states. Reproduction Cost Estimates[13] are

---

[13]Reproduction cost is an estimate of what it would cost to reproduce the entire utility plant and all appurtenances at or about the time the rate proceeding is initiated. Obviously, in one sense of the word it is a huge, educated guess. But so often were these studies made and of such importance did they become in rate-making cases that in the course of time, their preparation became what might be loosely called a form of science. Indeed there was a time when many lawyers were convinced that in the eyes of the Supreme Court of the United States, reproduction cost depreciated was the only acceptable evidence of value for rate purposes, Bonbright, *Valuation of Property,* Vol. 2, P 1086. Later, however, the Court in several opinions re-emphasized the fact that reproduction cost depreciated was but one element in arriving at fair value. *Georgia Ry. & Power Co. v. Railroad Comm. of Georgia,* 262 *U. S.* 625, 43 *S. Ct.* 680, 67 *L. Ed.* 1144.

It is said that one of the great fallacies of the reproduction cost method is that it is subject to the errors of human judgment and this, of course, is true. As has been observed, a reproduction cost study is a gigantic appraisal of the various components which make the whole of a utility. Books have been written on this subject and I can discuss it but very briefly. Literally every building, piece of land, yard of wire, telephone pole, telephone instrument, truck, etc., owned by the utility is appraised and the sum total of these values depreciated

favorite methods of valuation in the so-called fair value states, most of which, as the following quotations will demonstrate, still follow the doctrine as applied by the Federal Courts prior to the *Hope Natural Gas Case.* Thus, in *Solar Electric Co. v. Pennsylvania Public Utilities Comm.,* 137 *Pa. Super.* 325, 9 *A.* 2d 447, 460, the Superior Court of Pennsylvania said:

"We are of opinion that the order here appealed from, based, as it is, solely upon the commission's finding of the 'original cost of fixed capital installed at May 31, 1937' and without giving any consideration whatever to the 'reproduction cost' of

---

produces a figure which, in theory, demonstrates what it would cost to reproduce the entire plant and equipment as of the time of the rate hearing. To this is usually added some figure representing going value and another sum for cash working capital. *Los Angeles Gas & Electric Corp. v. Railroad Comm.,* 289 *U. S.* 287, 53 *S. Ct.* 637, 77 *L. Ed.* 1180. Now it is very obvious that the judgment of individuals will vary sharply in estimating values of the sort described. But there are even more serious difficulties. Imagine, for instance, the number of telephones owned by this Company, the number of telegraph poles. Clearly, this sort of equipment cannot be individually appraised. The Company had, I believe, some 56,000 poles. Two per cent, or about 1100, were exhaustively spot checked for condition, and based upon the results of the spot check, all poles were given a valuation by means of the Tippett method. Other recognized methods of arbitrary valuation have long been in use. Concededly, in such an undertaking as described, when differences in judgment and, even worse, the errors attendant to mass valuation by arbitrary formula, are ever present, no two such studies would ever be exactly the same.

A second fallacy in this method of valuation is frequently pointed to by economists viz., although the announced objective of the reproduction cost study is to ascertain the amount which it would cost to reproduce the plant of the utility at the time of the rate proceeding, yet it is unlikely that the identical plant would ever be reproduced at that time because technological advances would dictate the construction of a substantially different system.

Despite these and other criticisms, the reproduction cost depreciated method of valuation was probably regarded by the Supreme Court of the United States as the most satisfactory available evidence of fair value, and it is still relied upon heavily by the fair value states. In the preparation of these studies, certain artificial techniques were rapidly developed. Thus, supposing roughly that the total cost to reproduce the system as of the time of the rate proceeding were $20,000,000, it would be arbitrarily assumed that it would take, say, two years to complete the job. A theoretical engineering staff was assembled, etc. Even the organization and other preconstruction costs of organizing the utility together with a reasonable sum representing contingencies have been allowed. An item of interest on the cost of the plant during construction was commonly allowed. 43 *Am. Jur., Public Utilities,* see generally, Sec. 112-118 and 48 *L. R. A., N. S.,* 1040 *et seq.*

the property as one of the factors to be taken into account in ascertaining its present 'fair value', constitutes an 'error of law' as that phrase is used in Section 1107 of Art. XI of the *Statute of 1937*, 66 *P. S.* § 1437, particularly where the appellant alleges confiscation.

"From *Smyth v. Ames*, 169 *U. S.* 466, 18 *S. Ct.* 418, 42 *L. Ed.* 819, down to and including *Railroad Commission of California v. Pacific Gas & Electric Co.*, 302 *U. S.* 388, 58 *S. Ct.* 334, 82 *L. Ed.* 319, and throughout the decisions of our Supreme Court and of this court, the cost of reproducing the property has consistently been held to be not only a relevant but also an essential element in the ascertainment of its 'fair value' for rate-making purposes."

The Supreme Judicial Court of Maine, after emphasizing that it is the duty of the Commission in rate cases to ascertain the fair, present value of the utility's property, said:

"The present value may be affected by the rise and fall of prices of materials. If in such way the present value of the structure is greater than the cost, the company is entitled to the benefit of it. If less than the cost, the company must lose it." *New England Tel. & Tel. Co. v. P. U. C., Me.*, 94 *A.* 2d 801, 806.

In *Illinois Bell Tel. Co. v. Ill Com. Comm.*, 414 *Ill.* 275, 111 *N. E.* 2d 329, 336, the Supreme Court of Illinois said this in reference to fair value:

"The statutory language that rates and charges made by a public utility shall be 'just and reasonable' has remained unchanged since the *Public Utilities Act of 1913* [*S. H. A.* ch. 111⅔, § 1 *et seq.*]. In construing the statute this court held that the Commission must use a rate base which represents the present fair value of the utility property, arrived at after full and proper consideration of reproduction cost, and a reasonable return, based upon an appraisal of the opportunities available for investment in other enterprises. *State Public Utilities Comm. v. Springfield Gas & Electric Co.*, 291 *Ill.* 209, 125 *N. E.* 891.

"In 1933 the legislature added section 36 to the Public Utilities Act, which provided for temporary rate reductions when the Commission finds that a utility's earnings are '* * * in excess of the amount required for a reasonable return upon the value of said public utility's property used and useful in rendering its service to the public, * * *.' This court further held, as it had previously done on many occasions, that the determination of just and reasonable rates under the Illinois statute depends upon the present fair value of a utility's property."

And, in *Northern States Power Co. v. Public Service Commission*, 73 *N. D.* 211, 13 *N. W.* 2d 779, 785, the Supreme Court of North Dakota stated:

"In the former appeal in this case (*Northern States Power Comm. v. Board of R. R. Com'rs*, 71 *N. D.* 1, 298 *N. W.* 423) we held that the fair value formula as set forth in *Smyth v. Ames*, 169 *U. S.* 466, 18 *S. Ct.* 418, 42 *L. Ed.* 819, and as modified by subsequent decisions of the Supreme Court of the United States had been adopted by the Legislature of this State in 1919 as the formula for determining rate bases for public utilities. There can be no doubt today, but that, insofar as the federal courts are concerned, the 'ghost of *Smyth v. Ames* had been laid.' * * * That circumstance, however, has no bearing upon the question before us now. We are concerned with the law of this State as enacted in 1919. In the decision in the former appeal in this case we gave extended consideration to the construction of this statute and we see no reason now to modify that construction."

Ohio, by statute directs its Commission to determine fair value based upon reproduction cost alone. *City of Columbus v. Public Utilities Comm.*, 154 *Ohio St.* 107, 93 *N. E.* 2d 693, 699. On the other hand, the Illinois statute contented itself with directing the Commission to fix just and reasonable rates. Yet, the Supreme Court of that state construed it to be a fair value statute. *Illinois Bell Tel. Co. v. Ill. Com. Comm.*, 414 *Ill.* 275, 111 *N. E.* 2d 329.

## Interpretation of Title 26

Counsel for the Commission and the Company are in sharp disagreement as to whether Title 26 of the 1953 *Code* places Delaware in the category of a fair value state. Certainly, much of the language could have been more plainly phrased and a categorical answer is not indicated even after à careful study of all its sections.

The Commission takes the position that the Legislature, having in mind the *Hope* case elsewhere mentioned, has contented itself with authorizing the Commission to regard the justness and reasonableness of the rates as the sole criterion in rate-making. Conceding that the Federal Commission in the *Hope* case was authorized, as here, to fix " 'just and reasonable' rates", the fact remains that there are many and substantial differences between the Federal Act there under interpretation, 15 *U. S. C. A.* § 717 *et seq.*, and our Title 26. Section 126 begins by authorizing the Commission, if it should determine it to be necessary, to ascertain the fair value of the property of a public utility; that in so doing the Commission "* * * may determine every fact, matter, or thing which, in its judgment, does or may have any bearing on such value; and may take into consideration, among other things * * *", and then follows practically verbatim the famous dictum from *Smyth v. Ames,* elsewhere cited, which fathered the so-called fair value doctrine. Section 127, entitled "Rate Fixing", merely directs the Commission upon notice and a hearing to fix "just and reasonable * * * rates," etc. There is no expressed connection between Sections 126 and 127, and Commission counsel argues that that fact, together with the facts that the Commission is not directed to ascertain fair value in every case nor required to consider in so doing the various formulae announced in the dictum from *Smyth v. Ames,* conclusively demonstrates that Title 126 is not a "fair value" statute. Company counsel asks why, then, if such is the case, does

Section 126[14] use the significant words "fair value" and why is the dictum from *Smyth v. Ames* included at all—both fair questions. However, a careful consideration of other sections of the Act convinces me that Section 127 is not of paramount significance. In fact, I believe it has to do only with fixing rates in special cases. Aside from Section 126, the material sections of the Act are, in my judgment, Sections 151, 152, 155 and above all, 156. Section 151 is the section under which a utility would normally apply for an increase in rates. It provides that a utility shall make no changes in rates except upon 30 days notice to the Commission which notice must clearly state the proposed changes and set forth the new schedules. Section 152 provides that upon the filing by a utility of any schedule stating a new rate, the Commission may enter into a hearing concerning the lawfulness thereof. Sec. 155 authorizes the Commission, should it find any such proposed new rate unjust, to determine "just and reasonable" rates. And Section 156 apparently empowers the Commission upon information, or upon its own initiative, to enter into a hearing to reduce rates wherever it appears that a utility is charging excessive rates. In this connection, should it appear that such a hearing might take more than 90 days, the Commission is empowered to enter an arbitrary, temporary reduction in the utilities' rates. So important is the language of this Section in its bearing upon the true interpretation of this Act that it is herewith quoted from at length:

"Whenever the Commission, after due consideration of pertinent facts and information, is of the opinion that any rates of any public utility are producing a return in excess of a fair return upon what appears to be the fair value of the property of such public utility, used and useful in the public service, and that a proceeding to determine all of the issues involved in a final determination of such rates will require more than 90 days the Commission may, after reasonable notice to the public utility

[14]Title 26 is patterned on the *Pennsylvania Act* of 1913, P. L. 1374, which is a fair value statute. Our Sec. 126 and Art. V, Sec. 20, of the Old Pennsylvania Act are substantially the same.

and opportunity to be heard thereon, if the public interest so requires, immediately enter a temporary order fixing a temporary schedule of rates to be charged by such public utility pending the final determination of such rate proceeding, which order shall become operative and binding upon such public utility at the time prescribed by the Commission. The power of the Commission to order reductions in rates and charges of any public utility by means of such temporary order shall be limited to reductions which will absorb not more than the amount found to be in excess of the amount of operating income, as determined by the Commission, necessary to provide a fair return on what appears to be the fair value of the property of the public utility."

Now, here is the very crux of the matter. Although Section 156 deals only with rate reductions, it provides that such reduction shall not lower the rates below a point which will allow the utility to earn a fair return upon what appears to be the fair value of the property of such public utility used and useful in public service. If, thus, the Commission in reducing utility rates is required always to maintain them at such a level as will permit the Company to earn a fair return upon the fair value of its property, how, upon petition by a utility to increase rates, could it fix just and reasonable rates under Section 155[15] on any other basis than a fair return upon the fair value of its property? It cannot. Section 156 is, I believe, the key to the point under inquiry.

The Commission argues that since Title 26 of the 1953 *Code* was passed after *Smyth v. Ames* was reversed and at a time when the *Hope* case was the law of the Federal Courts, the strong inference is that there was no intention to embody the philosophy of fair value within its terms. Quite to the contrary, I am unable to understand how the Legislature could have in-

[15]In order to render clearer what I am convinced is the true meaning of Sec. 155, the Legislature might well have inserted therein language as it did in Sec. 156, requiring not only that the rates so fixed be "just and reasonable" but also that they be designed to produce a fair return on the fair value of the property.

tended anything else. Had it intended to repudiate fair value, then why did it use language so strongly reminiscent of *Smyth v. Ames*, and other cases dealing with fair value hereinabove discussed? The reasonably clear answer is that the Legislature has chosen to adopt for this State a fair value statute. Why, in the face of the long continued criticism of *Smyth v. Ames* and of its repudiation by the Supreme Court in the *Hope* case, it chose to adopt the fair value theory of rate-making is a matter not within my province[16]. And because the Delaware statute differs materially from that before the Court in the *Hope* case, this Court would not feel bound by that decision. The following authorities support the conclusion: *Peoples Natural Gas Co. v. Pennsylvania P. U. C.*, 153 *Pa. Super.* 475, 34 *A.* 2d 375; *Northern States Power Co. v. Public Service Comm.*, 73 *N. D.* 211, 13 *N. W.* 2d 779; *New England Tel. & Tel. Co. v. Dept. of Pub. Utl.*, 327 *Mass.* 81, 97 *N. E.* 2d 509; *New England Tel. & Tel. Co. v. P. U. C.*, *Me.*, 94 *A.* 2d 801; *Illinois Bell Tel. Co. v. Illinois Commerce Comm.*, 414 *Ill.* 275, 111 *N. E.* 2d 329.

My interpretation of Title 26 is that the Public Service Commission of this State is directed to establish rates for all utilities operating within this State at such levels as will produce a fair return upon the fair value of their properties. It means that the fair value must be the present, fair value with the result that when the value of the property has risen, the utility is entitled to a return on that increased value and vice versa. It does not seem to compel a determination of fair value in every instance[17] but, if the Commission elects so to do, then Section 126 provides a number of guides for consideration by the Commission in arriving thereat. The section designates no particular formula for arriving at fair value nor does it direct the Commission to take into account even those statutory guides set

[16]Perhaps for the very good reason that Justice Jackson's dissent demonstrated the inherent weakness in the majority opinion in the *Hope* case.

[17]I should think that in any important application concerning rate changes when it is reasonable to believe that the value of the property of a utility has substantially increased or decreased, the Commission would elect to hold a valuation hearing.

forth therein. But it expressly commands that all things going into the Commission's determination shall be given such weight as may be "just and right". Finally, although in the normal case the fixing of a fair return upon the fair value of the utility property would be tantamount to establishing a just and reasonable rate, it is conceivable that a time might come where, because of an extraordinary rise in prices, a fair return on the then fair value of a Company's property might produce a rate which would be unreasonable for the public. In such an unusual event, a Commission might be justified in scaling down the rates to a reasonable level. This thought is suggested by a dictum from *Willcox v. Consolidated Gas Co.*, 212 *U. S.* 19, 52, 29 *S. Ct.* 192, 53 *L. Ed.* 382, but to my knowledge, such a situation has never been presented to a Court.

### The McLean Exhibit

Much of the controversy here concerns an earnings statement prepared by the Commission's expert witness, a Mr. McLean, an accountant connected with the Maryland Public Service Commission. He took an earnings statement prepared by the Company and sharply revised it in accordance with his own theories of accounting, with the result that, in the end, the annual net earnings for the Company under the former rates for the given test period appeared to be $1,126,858 as contrasted with the Company's findings that the going rate of earnings was $992,818. The Commission adopted most of the McLean theory of accounting and, again, following his lead, disallowed the Company any amount for cash working capital. The Company claims substantial error on the part of the Commission in so doing. Before taking up these objections in detail, however, certain general comments concerning the functions of the Commission should be made.

In the first place, a number of letters from subscribers were placed on the record protesting any rate increase and urging the Commission to "hold the line" in an effort to halt inflation. Whether the Commission was in any way influ-

enced by these communications, I do not know, but, in fact, several pages of the record are devoted to the possible impact on various groups of working people, farmers, etc., of a raise in telephone rates. I do not regard such testimony as relevant to the issues before the Commission in this proceeding and, accordingly, feel it proper to point out that its functions in no sense include those of a price control board. The power and authority of this Commission, insofar as concerns an application for a rate increase, cease when it has approved a schedule of rates which should produce a fair return on the present fair value of the property of a utility.[18]

Secondly, the Public Service Commission is vested with broad powers and wide discretion. It is not, however, authorized to invade the province of the Boards of Directors of those utility corporations coming within its jurisdiction. Those matters constituting business judgment are for the Boards of Directors of the particular utility corporations to decide, not the Public Service Commission. Thus, the rule is that for rate-making purposes, a Commission must consider and allow the normally accepted operating expenses of a utility corporation unless found to have been made in bad faith or out of an abuse of discretion. As the Supreme Court of Illinois said in *State Public Utilities Comm. v. Springfield Gas & Elec. Co.*, 125 *N. E.* 891, 901, approved by U. S. Sup. Ct. in *State of Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 *U. S.* 276, 289, 43 *St. Ct.* 544, 67 *L. Ed.* 981:

"* * * the commission is not the financial manager of the corporation, and is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses, unless there is an abuse of discretion in that regard by the corporate officers."
The same principle was re-announced in different language by the Supreme Court in *West Ohio Gas Co. v. Public Utilities Commission*, 294 *U. S.* 63, 72, 55 *S. Ct.* 316, 321, 79 *L. Ed.* 761:

---

[18]Except in the rare situation suggested in the *Willcox* case, *supra*. No such case is presented by this appeal.

"Good faith is to be presumed on the part of the managers [directors] of a business. * * * In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay."

See also in this same connection *Havre De Grace & Perryville Bridge Co. v. Public Service Commission,* 132 *Md.* 16, 103 *A.* 319; *Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co.,* 253 *Ala.* 1, 42 *So.* 2d 655. It is becoming the fashion, as will later appear, among some State Public Service Commissions and with a few state Courts to depart from this long settled principle insofar as concerns rate-fixing, but with exceptions hereafter stated, I believe it essential to abide by the settled rule just stated. Mr. McLean, nevertheless, chose to take the view, and the Commission unfortunately followed him, that American Telephone & Telegraph Co., the parent corporation, exerts an improper influence over its affairs in certain respects. His assumptions in this connection, without valid evidence to support them, seem to form the basis for certain of his theories of accounting to which counsel for the Company emphatically objects.

## Cash Working Capital

In the first place, the Commission refused to include in the rate base the Company's estimate of $382,963, representing cash working capital. Now cash working capital has always been regarded as a necessity in the operations of a corporation. Many decisions have emphasized the importance of an allowance for working capital in rate cases. *Smyth v. Ames* referred directly to the necessity for considering not only all the corporations' physical assets but also "the sum required to meet operating expenses".[19] [169 *U. S.* 466, 18 *S. Ct.* 434.] See to this same effect *Vincennes Water Supply Co. v. Public Service Comm.,* 7 *Cir.,* 34 *F.* 2d 5, 8, *certiorari* denied 280 *U. S.* 567, 50 *S. Ct.* 26, 74

---

[19]Now commonly called cash working capital. This language is incorporated in Sec. 126 of the *Delaware Code.*

*L. Ed.* 621; *Brooklyn Borough Gas Co. v. Prendergast, D. C.,* 16 *F.* 2d 615, 631; *City of Columbus v. Public Utilities Comm.,* 154 *Ohio St.* 107, 93 *N. E.* 2d 693, 697-698; *City of Norfolk v. Chesapeake and Potomac Tel. Co. of Va.,* 192 *Va.* 292, 64 *S. E.* 772, 780; *Columbus Gas & Fuel Co. v. Public Utilities Comm.,* 292 *U. S.* 398, 406, 54 *S. Ct.* 763, 78 *L. Ed.* 1327. Nevertheless, the Commission took the position, and it must be admitted that the Supreme Courts of Pennsylvania and Maryland[20] have done the same, that there is no need for the allowance of cash working capital in the rate base because the Company has alternative funds from which day-by-day operating expenses can be paid.

The theory underlying this proposition is, in brief, that payment by the subscribers of their bills for telephone services provides adequate funds monthly for all normal Company operating expenses and taxes. No doubt, this is true not only of this Company but many other large non-regulated corporations. Conceding that many corporations, including this Company, receive sufficient funds from sales, etc., to meet their usual operating expenses and taxes, yet it is prudent to have on hand funds to provide against emergencies. Many concerns and individuals are accustomed to purchase government tax anticipation certificates in large amounts with which to meet accrued tax obligations. There is no magic about the term cash working capital. It is the product of centuries of business wisdom and experience. The degree of liquidity demonstrated by a high ratio of current assets to current and accrued liabilities is normally accepted as evidence of a sound financial condition. With deference to the opinions of those Courts which have expressed contrary views, I, nevertheless, feel that a regulatory commission is not justified in interfering with the sound business judgment of Boards of Directors of utility corporations who feel it expedient to keep on hand a fair measure of cash working capi-

---

[20]*City of Pittsburgh v. Pennsylvania Public Utilities Comm.,* 370 *Pa.* 305, 88 *A.* 2d 59; *Chesapeake & Potomac Tel. Co. v. Public Service Comm., Md.,* 93 *A.* 2d 249.

tal. The action of the Commission in disallowing all cash working capital is reversed. From this it does not follow that the Commission is bound to accept any figure for cash working capital that a utility corporation chooses to state. I notice from a reading of the record that the Company apparently has kept on hand cash balances averaging more nearly $150,000 than $380,000.[21] Assuming that a corporation's needs are demonstrated by the history of its financial practices, I would suggest that it is within the power of the Commission to scrutinize the record and, if fairly satisfied that $150,000 has more nearly approximated the Company's past average needs for working capital, then to use such figure, adjusted to an intra-state basis, in computing the rate base. The adjusted figure would approximate $100,000. There is another reason why there was error which I shall touch on but very briefly. All Mr. McLean's testimony in regard to the so-called alternative funds theory of working capital was based upon the books, not of the Diamond State Telephone Company of Delaware, but of an affiliated company in Maryland. Mr. McLean and the Commission simply assumed that a study of this Company's books would reveal the same facts as existed in the Maryland company.[22] Counsel for the Company properly objected to the admission of such testimony. Perhaps a study of the books of the Delaware Company would reveal precisely the same facts as existed in the Maryland corporation but no such study was made and no such facts actually found and placed on the record. The action of the Commission, then, was based, not on evidence, but assumptions, and was error.[23]

---

[21]When additional funds are required, they are borrowed from American Telephone & Telegraph Co.

[22]He testified it would take two months to make a similar study of this Company's books.

[23]While the Commission is not bound by technical rules of evidence, Title 26, Sec. 183 (a), there must be some basis in fact upon which to predicate such an important decision as disallowing $380,000 of cash working capital in the rate base.

## The Test Period

The year ended April 30, 1953, reflected the latest actual figures for Company operations prior to the hearing in this case. In order to determine the net income applicable to its property, the Company chose the period from October 31, 1952 to October 31, 1953, six months of actual operations and six months of estimated operations, with the result that the average of operating expenses for rate-making purposes was computed as of April 30, 1953, a date very close to the actual hearing date. The Commission chose the period beginning April 30, 1952 and ending April 30, 1953, so that the average of its operating expenses was computed as of October 31, 1952, a period considerably prior to the date of hearing. Each side criticizes the other's choice of a test period. The Company argues with much force that inasmuch as the object of this proceeding is to determine rates for the future, actual figures and estimates for the future should be averaged to a date close to that of the hearing date. It contends also that the Commission test period tends unfairly to indicate stable earnings when the fact is, by using the latest figures, the earnings are shown to be downward. Also, it argues that in choosing a test period actually ending two and one-half months prior to the hearing date, it is deprived entirely of the advantage of any capital investment made, or actual increases in wages or other operating costs incurred, between then and the hearing date.

There is merit in the Company's position in this respect but, as pointed out earlier, the Commission in its determinations has a measure of discretion with which a Court should not, and usually will not, interfere. All available arguments do not favor the Company's stand in this connection. There must be some arbitrary test period with some arbitrary cut-off date. The Commission, choosing its test period, seemed to prefer a period which reflected actual operating figures. It did not choose to accept a test period half of which was based

on actual operations and half upon estimates for the future.[24]
Again, for all I know, it may have had in mind, as do so many
economists, that the year 1954 might very well show a down-
ward trend in prices. Moreover, as I read the cases, a majority
of the Courts do not insist that estimates for the future be taken
into account—rather that the latest available figures be con-
sidered. See in this connection, *City of Pittsburgh v. Pennsyl-
vania Public Utilities Comm.*, 171 *Pa. Super.* 187, 90 *A.* 2d 607,
618; *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv.
Comm.*, 262 *U. S.* 276, 287-288, 43 *S. Ct.* 544, 67 *L. Ed.* 981.[25] On
the other hand, compare *Indiana Bell Tel. Co. v. Pub. Serv.
Comm.*, 93 *P. U. R.* 480 (Indiana Circuit Ct. Marion County,
Jan. 24, 1952, not officially reported) which, apparently, sus-
tains the Company's position in this respect.

After weighing all these arguments pro and con, I
feel that the equities favor the Company's position. However,
I cannot say categorically that the Commission's view of the mat-
ter is wrong. Accordingly, I conclude that this particular subject
is one within the reasonable range of Commission discretion
with which a Court should not interfere.

### Wages

To the extent, however, that the Commission ex-
cluded the effect of a wage increase granted by the Company
during the test period,[26] it committed error and is directed to
make appropriate re-adjustments in the Company's operating

---

[24]It is a fact, nevertheless, that the Company estimates for May, June and
July came to within ½ of 1 per cent of actual operating figures when ascer-
tained.

[25]"It is impossible to ascertain what will amount to a fair return upon
properties devoted to public service without giving consideration to the cost
of labor, supplies, etc., at the time the investigation is made. * * * Estimates
for tomorrow cannot ignore prices of today."

[26]There is authority for the proposition that wage increases becoming effec-
tive during the rate hearing itself may be considered and taken into considera-
tion. *City of Philadelphia v. Pennsylvania P. U. C.*, 162 *Pa. Super.* 425, 57 *A.* 2d
613. I do not understand that the Company takes this position as to the second
wage increase which it incurred during the course of the hearing.

income,[27] *Bell Tel. Co. of Nevada v. P. S. C., Nev.*, 253 *P.* 2d 602, 608.

### The Commission's Refusal to Eliminate a Non-Recurring Tax Refund Received by the Company During the Test Period.

During the test period chosen by the Commission, it appears that the Company received a tax refund. This refund was a non-recurring item and was related to quite another year. The Company eliminated this item in calculating its operating expenses because it tended unfairly to increase the earnings picture. The Commission, following Mr. McLean's recommendation, arbitrarily included it. In my judgment, the action of the Commission was error. It was the Commission which insisted upon a test period which would fairly reflect actual operating figures for a given test period. A windfall such as a non-recurring tax refund not related to the test period is not a normal operating figure for that period. The decision to include this refund, and thus to overstate the prospective net earnings by this same amount, is inequitable and the Commission is directed to readjust its determination accordingly.

### Exclusion by the Commission of Charitable Contributions from the Company's Operating Expenses

Again following Mr. McLean's lead, the Commission refused to include in the Company's operating expenses the sum of $3653, representing charitable contributions. Mr. McLean's theory was that this resulted in the subscriber making his own personal contribution and standing a share of the Company's contribution also. It is to be noted that these contributions were all for recognized local charities such as the United Fund and Red Cross. They amounted to less than 1/10 of 1 per cent of total operating expenses. Both the Federal and State tax laws encourage charitable contributions by granting stated exemp-

---

[27]One is permitted to wonder whether, if the Company had effected a substantial reduction in hourly wages with its union between April 30 and the hearing date, the Commission in the public interest would not have felt obliged to readjust the earnings statement to reflect this fact.

tions to the corporate as well as individual taxpayer. It is obvious, and it was so testified that these small contributions were for purposes of good will in the locality. Also, under normal circumstances, the action in making such contributions would seem to have been well within the discretion of a Board of Directors. On the other hand, charitable contributions differ from other operating expenses in the sense that, aside from the factor of good will, they amount almost to an outright gift. Thus, the rule seems to have been settled that such contributions will be denied for rate-making purposes unless it is shown that they were "for the benefit of, and incurred in the service of," the patrons of the utility.[28] Just what "for the benefit of and incurred in the service of the patrons of the utility" means is not clearly explained by the cases, but I would suppose it meant that the Corporation must be shown to have received some tangible benefit from the gift. Certainly, I can take judicial notice that the Red Cross and each participant in the United Fund is a patron of this Company. And the fact that these contributions were in the interest of community good will is of substantial importance. Mr. Justice Brandeis, although for another reason, took occasion to comment in his dissenting opinion in *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm., supra,* upon the importance of good will between a utility and its community.[29] Boards of Directors of local charities are usually peopled with prominent citizens in the locality who are more interested in seeing a given corporation contribute than listening to reasons why it thinks it cannot. Since these contributions were very modest, all to local charities and obviously for good will purposes, I feel it as important as a matter

---

[28]*Reno Power Light & Water Co. v. P. S. C., D. C.,* 298 F. 790, 801; *New Jersey Bell Tel. Co. v. Dept. of Pub. Utilities,* 12 N. J. 568, 97 A. 2d 602, 616.

[29]"* * * The public relations of the utility to the community are apt to become more and more strained, and a victory for the utility may in the end prove more disastrous than defeat would have been. The community defeated, but unconvinced, remembers, and may refuse aid when the company has occasion later to require its consent or co-operation in the conduct of its enterprise." [262 U. S. 276, 43 S. Ct. 553.] Here Justice Brandeis was speaking of over-frequent applications for increased rates made by utility corporations.

of principle as financial result, to hold that the Company here has substantially complied with the spirit of the announced rule. The action of the Commission in disallowing these contributions is reversed.

The Fictitious Increase by the Commission of the Company's

Outstanding Debt in Order to Reduce Federal Taxes

Perhaps the best example imaginable of the lengths to which Commission interference with the internal affairs and management of utility affairs might go, if permitted, is demonstrated by the action of this Commission in fictitiously increasing the Company's debt ratio in order to increase its deductions for Federal tax purposes. This again seems to have represented a theory of Mr. McLean's. Mr. McLean noticed with sharp disapproval that this Company had outstanding only $3,000,000 of bonds and $1,060,000 of advances from affiliated companies. If, he testified, the Company carried the same debt ratio to capital as its parent American Telephone & Telegraph Co., (about 44%) then the tax deductible interest payments would be sharply increased, Federal taxes would be reduced and relatively higher net earnings on the smaller amount of the common stock of the Company would result. Therefore, he arbitrarily assumed a debt ratio for this Company of about 44%, computed Federal tax deductions accordingly and included the higher earnings thereby resulting in the Company's earnings statement. By this act of mental legerdemain, the Company's income was fictitiously increased by over $57,000.

I had always assumed until now that a Corporation with very little debt presented an attractive inducement to investors. If direct Commission interference in a Corporation's financial affairs were to be permitted at all, I would have thought it would have been exercised for the purpose of rendering it debt free rather than debt ridden. I know of nothing more exclusively within the sound discretion of corporate directors than the exercise of judgment concerning its financial affairs. And yet, upon mere suspicion of parental domination

by American Telephone & Telegraph Co., even this hitherto sacred province is now invaded by the action of a Public Utility Commission. If this Commission's decision were upheld in this respect, the Corporation might feel compelled against its judgment to increase its debt limit in order to gain actual, rather than fictitious advantage, of the tax deductions so thrust upon it. Obviously, this places the Commission in a position indirectly to influence important decisions of the directors. If a reasonable observance of the rule of the *Southwestern Bell Telephone* and *West Ohio Gas* cases above discussed is not insisted upon by the Courts, Public Service Commissions could easily cease to be regulators and become dictators. This action was arbitrary, invaded the reasonable range of discretion of the Board of Directors, and was error.

### Fair Value and Reproduction Cost

Before considering the disputed question covering a proper rate base, a few preliminary observations on fair value and reproduction cost should be made. Fair value, as has already been observed, is an illusion. The statute, Section 126, lays down some guides for arriving at it but no definition of the word itself. It is like the well intentioned old lady who leaves written instructions with her chauffeur for meeting John Jones at the Pennsylvania Station, at 5 P. M. Standard Time, upper level, Gate 3, but forgets to describe him. Yet, it is this vague objective which Commissions in all fair value states are required to pursue and which, once found, forms the basis for "just and reasonable" rates.

Just and reasonable rates, so the Courts have frequently said, are rates such that:

"* * * after paying all expenses of operations, setting aside the necessary sums for depreciation, payment of interest, and reasonable dividends, there should still remain something to be passed to the surplus account, and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility * * *."

*United Railways & Electric Co. v. West,* 280 *U. S.* 234, 251-252, 50 *S. Ct.* 123, 126, 74 *L. Ed.* 390; *Federal Power Commission v. Hope Natural Gas Co.,* 320 *U. S.* 591, 603, 64 *S. Ct.* 281, 88 *L. Ed.* 333. And of course, it necessarily follows that a rate which "* * * does not admit of that being done * * *" is in violation of the Fourteenth Amendment because it does not permit a utility to earn a fair return on the fair value of its property.

 The Commission's estimate of fair value was arrived at by (a) either taking Mr. McLean's determination of an average rate base, $18,637,948, and adding to it the sum of $3,362,052, representing reproduction cost or (b) taking the original cost of plant, etc., as of April 30, 1953, less depreciation, a net total of $19,766,643, to which was added $2,233,357, to allow for inflation, or reproduction cost. If the latter method was used, the Commission determined fair value by adding a weight equal to 12% of original cost to allow for inflation.[30] The Commission's witness pointed out all the fallacies inherent in the reproduction cost method of valuation which have been discussed in an earlier footnote. Significantly, while the Commission made reference to Mr. McLean's testimony in this respect, it made no specific findings in derogation of the Company's exhibit. In fact, it neither criticized it nor tended to disallow so much as a single item of it. With deference, I would suggest that while Mr. McLean presented the universally recognized criticisms of the method, he did not remark on such virtues as it may possess. In the first place, Delaware is a fair value state. Unless, then, some portion or all of a utility's reproduction cost study is palpably erroneous, and so found, the Commission is bound to accord it weight in times such as these. I say this with full realization that Section 126 does not demand that weight be accorded reproduction cost but, as a practical matter, I know of no method of valuation which purports to give a fair, present value

[30]The depreciated original cost of Telephone Plant in Service, (Account 100.1) as of April 30, 1953, was $18,808,970 to which $2,233,357 was added to allow for inflation, or reproduction cost. The amount added for reproduction cost, $2,233,357 in this instance, is equal to 11.87% of the depreciated original cost of Telephone Plant in Service (Account 100.1) or $18,808,970.

to all types of plant and equipment regardless of when built or installed.

Assume these simple facts. A utility has lands, buildings and equipment of all storts costing $5,000,000 prior to 1940. It gradually installed equipment costing $2,000,000 from 1940 through 1945. It gradually installed equipment costing $4,000,-000, from 1945 through 1952. Now, it is obvious that to attempt to obtain the fair, present value of the whole plant and equipment in 1953 by the original cost method would be abortive. As to that portion of the equipment added in, let us say, 1950, 1951 and 1952, an original cost study would reflect values with some degree of accuracy. But with respect to the earlier years, this method of valuation would grow less accurate with the result that when it is applied to the 1940-1945 period, it would not reflect present values at all fairly. And as for the lands and buildings purchased or constructed prior to 1940, probably by now worth 7 or 8 million dollars, such a study would, no doubt, reveal a value of from $3\frac{1}{2}$ to 4 million dollars, for depreciation would substantially reduce the original cost of the property. A reproduction cost estimate is designed to meet the very situation here presented and no other method, except original cost trended, which is about the same as reproduction cost, has been suggested to me which can deal with this problem. This is why I state categorically that despite the fact that Section 126 does not require the Commission to consider and give weight to reproduction cost, yet in order to arrive at a present, fair value under such conditions of inflation as now exist, practical considerations demand that reproduction cost or its equivalent, not only be considered but given substantial weight.[31]

Nor is the fact that a reproduction cost study is an estimate sufficient to render it inadmissible. *New Eng. Tel. & Tel. Co. v. P. U. C., Me.,* 94 *A.* 2d 801, 808. The Commission may

---

[31]It is significant that Art. V, Sec. 20 of the *Penna. Act* of 1913 is almost identical with our Sec. 126 and yet the Penna. Courts have reversed the Commission for employing the original cost method of valuation alone. *Solar Electric Co. v. Pennsylvania Public Utl. Comm.,* 137 *Pa. Super.* 325, 9 *A.* 2d 447, 460.

not use such study as the sole evidence of fair value but it should give it such weight, as under all the circumstances it deserves. *Los Angeles Gas & Elec. Corp. v. Railroad Comm.*, 289 *U. S.* 287, 308, 53 *S. Ct.* 637, 77 *L. Ed.* 1180. Mr. McLean, however, admitted that he did not believe in the fair value theory. Thus, he relied completely upon an original cost estimate, depreciated, which he prepared from the Company's books. In his judgment, the value of the Company's entire plant was not greater than demonstrated by his exhibit despite the marked inflation which has ensued in the past 13 years. In his complete rejection of the theory of reproduction cost or of some other method of valuation to reflect the present, fair value of the Company, he was wrong, at least during a period of recognized inflation, and the Commission was correct in not following him.

Again, with all the emphasis that has been laid upon the frailties of human judgment, none has been placed upon its strengths. The whole system of jurisprudence under which we live today is largely a matter of human judgment. Accounting, upon which Mr. McLean professes to rely as a true science, is scarcely more than the sensible application of a set of standards governing business finance.[32] There is such a thing as good judgment and bad judgment. The Company's expert witnesses give the impression entirely from the record, of course, of making a sincere effort to give an impartial picture of the fair value

---

[32]"To make a fetish of mere accounting is to shield from examination the deeper causes, forces, movements, and conditions which should govern rates. Even as a recording of current transactions, bookkeeping is hardly an exact science. As a representation of the condition and trend of a business, it uses symbols of certainty to express values that actually are in constant flux. It may be said that in commercial or investment banking or any business extending credit success depends on knowing what not to believe in accounting. Few concerns go into bankruptcy or reorganization whose books do not show them solvent and often even profitable. If one cannot rely on accountancy accurately to disclose past or current conditions of a business, the fallacy of using it as a sole guide to future price policy ought to be apparent. However, our quest for certitude is so ardent that we pay an irrational reverence to a technique which uses symbols of certainty, even though experience again and again warns us that they are delusive." From Justice Jackson's dissent in the *Hope Natural Gas* case [320 *U. S.* 591, 64 *S. Ct.* 307].

of the Company.[33] Their testimony in most respects was impressive. They made no apparent effort to build up false values. They omitted from the Company's reproduction cost study a number of items of cost such as interest on the fund under construction[34] which could run into as much as two million dollars,[35] organization expenses and contingencies, which even conscientious engineers might well have included. The criticism that the Company's estimate for reproduction was piecemeal rather than as if done by one large contractor on a single job may have merit, but any increased cost as a result would be more than offset by the savings on interest, organization expenses, etc., just referred to. The overall impression I draw from the Company's estimate in the light of a number of authorities on the subject which I have read, is that it is a workmanlike job. One rather significant check is that, despite one of the greatest and most prolonged inflations in the financial history of the land, the Company's estimate demonstrates that the reproduction value of its entire plant, including that built prior to 1940, has increased but 34% in value since 1940. Merely because construction costs have doubled since 1940, it does not follow that the value of the plant has increased 100%. Much depends upon when the various portions of the plant were built. The Company indicates that net additions to plant since 1945 exceed the size of the Company's plant in 1945. Thus, the percentage of increase seems reasonable. It is my conclusion that the Company's reproduction cost study presents admissible evidence of the fair value of the Company's whole plant and is entitled to substantial weight in this proceeding.[36]

[33]Mr. Wiltbank's testimony on this subject will be quoted hereafter in part.

[34]$250,000, a purely nominal sum, was allowed for this purpose.

[35]For instance, interest on $27,500,000, at 5% for 1½ years, ½ the estimated time of construction, a normal allowance, would come to over $2,000,000.

[36]"Q. Will you explain in more detail your statement that the Company's Reproduction Cost Study has avoided the use of construction hypotheses and is based upon the actual experience of the Company? A. Perhaps I can amplify my statement by explaining the treatment of several significant factors in my Reproduction Cost Study.

"First, with respect to the important item of labor, one type of Reproduc-

### The Proper Rate Base

The Commission arrived at a rate base of $22,000,-000. It did not disclose how it made its determination. Whatever its method was, it is apparent that, in result, it gave slightly over 10% weight to reproduction cost based on a rate base of $22,000,000. This compromise method of valuation has been the subject of criticism, *Consolidated Gas Co. v. Newton, D. C.*, 267

tion Cost Study would require assumptions by the Engineers or other experts making the study as to prevailing wage schedules in the State of Delaware as of the date of the Reproduction Cost Study, as well as to the number of persons whose labor would be required. On the contrary, my study has taken actual costs as experienced and reflected on the Company's books. It is evident, therefore, that with respect to Labor, my study is factual and not theoretical.

"Second, in the determination of Unit Costs for some Reproduction Cost Studies, the cost relating to the handling of supplies is developed on a theoretical basis which assumes the establishment of a supply organization of the size, character and experience necessary to reconstruct the entire plant during an assumed period of from three to five years. The costs reflected in my study relating to the handling of supplies are those actually incurred during the study period as reflected on the books. This same treatment applies to motor vehicle expense in that I have reflected the expense of the vehicles in accordance with the experience as shown on the books, whereas in some Reproduction Cost Studies, both the number and expense of the vehicles would be a highly conjectural matter.

"Third, my Reproduction Cost Study has, for all classes of property, included Engineering Costs on the percentage basis of the overall construction costs as reflected on the books, in accordance with actual experience. This treatment is to be contrasted with that made in other types of Reproduction Cost Studies where the amount claimed for Engineering Costs would result from building up a theoretical engineering organization of the character, size and experience which those making the study merely assume would be required for the particular period of construction.

"Fourth, the item of Omissions and Contingencies is a general overhead which appears in other Reproduction Cost Studies. I have not included a single dollar for such items in my Reproduction Cost Study, since I find no such costs recorded on the books and hence cannot fairly say that the Company has experienced any such costs.

"Finally, fifth, the item of interest during construction is usually a very substantial amount which is found in other Reproduction Cost Estimates where it is assumed that the entire plant is constructed within a three to five year period. My study reflects only the % interest during construction of all other costs which has actually been incurred by the Company in the building and installation of its plant during the last three years.

"I believe these illustrate how my Reproduction Cost Study has avoided the use of theory and is based on actual experience." Testimony of Mr. Wiltbank.

*F.* 231, 236-237. As Bonbright, *Valuation of Property*, Vol. 2, P. 1091, says:

"Many other compromises, however, are not reducible to definition. The commission or court takes 'due account' of a variety of 'elements of value,' especially those mentioned in the famous dictum in *Smyth v. Ames* [169 *U. S.* 466, 18 *S. Ct.* 418, 42 *L. Ed.* 819], later to be discussed; and it then reaches a 'fair value' which somehow splits the differences. Original cost and estimated current replacement cost are most frequently treated in this way. The property may be found actually to have cost $1,000,000; but its present 'replacement value' may be estimated at $2,000,000. By some unstated process of reasoning, the commission or court purports to conclude from these figures after giving proper weight to 'all other factors,' that the property is now 'really worth' $1,200,000, or $1,800,000, or any intermediate figure. Oddly enough, the precise mid-point between original cost and replacement cost is rarely hit upon—perhaps because such action would expose the choice as a mere compromise between inconsistent standards of rate making rather than a discovery of a supposedly definite 'fact'—the 'fair value' of the property."

On the other hand, a good many Commissions have used this compromise method. For instance, see *Chesapeake & Potomac Tel. Co. v. P. S. C., Md.,* 93 *A.* 2d 249. Under our statute, both reproduction cost and original cost are among those specified elements which may be taken into consideration in valuation. Valuation for rate purposes has never been a matter of formula. Rather it is a matter for the good judgment of the Commission which should not be disturbed unless clearly fallacious. Therefore, having elected to determine the rate base by a compromise between original cost and reproduction cost, I feel bound to accept the method employed, although not necessarily the result arrived at.

 It needs no citation of authorities to decide that an original cost estimate cannot properly reflect the fair present

value of a Company's plant where the construction costs have doubled in 13 years and there is no present likelihood of a material reduction in values in the immediate future. If the Commission had accorded no weight to reproduction cost or its equivalent, it would have been clear error. *Bluefield Water Works & Improvement Co. v. P. S. C.*, 262 *U. S.* 679, 43 *S. Ct.* 675, 67 *L. Ed.* 1176; *Missouri ex rel. Southwestern Bell Tel. Co. v. P. S. C.*, 262 *U. S.* 276, 43 *S. Ct.* 544, 67 *L. Ed.* 981; *Mercersburg Lemasters & Markes Electric Co. v. Public Serv. Comm.*, 76 *Pa. Super.* 58; *Illinois Bell Tel. Co. v. Ill. Com. Comn.*, 414 *Ill.* 275, 111 *N. E.* 2d 329; *New England Tel. & Tel. Co. v. Public Utilities Comm.*, Me., 94 *A.* 2d 801. Was the recognition by this Commission of an increase in value of the Company's plant of 11.87% of original cost, or about $2,233,000, sufficient to avoid the charge of confiscation in view of the fact that a conservative reproduction cost study indicated the fair value of the plant to have been over $6,000,000 in excess of that amount?

The Commission determined its rate base "* * * after duly considering all the testimony regarding reproduction cost values as well as the original cost * * * and after further considering all the related testimony in the case * * *." No other reasons for the decision are assigned. What factors may or may not have been decisive in the Commission's deliberations must always remain a matter of speculation. No doubt, Mr. McLean's attack on the Company's reproduction cost study as a mere estimate weighed heavily with the Commission but I have already decided that it was not only admissible but entitled to substantial weight.

Possibly, although again mere speculation, the Commission may have been influenced by its expert's calculations tending to demonstrate that, under alternative hypotheses, the Company is earning an adequate return on equity and thus needs no further rate increase. This argument is not persuasive. In the first place, it is the duty of the Commission to find and authorize a fair return on the Company's intra-state property, not

a return on the book value of common stock capital.[37] Again, the second, or alternative calculation, contains error because predicated upon an assumed 44% debt ratio to capital which has been condemned elsewhere in this opinion. Finally, both calculations seem to be based squarely upon the so-called "vicious circle" fallacy of reasoning which prohibits attempting to establish the assumed reasonableness of rates based upon earnings where rates themselves are the subject of inquiry, "* * * when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision." Chief Justice Hughes in the *Los Angeles* case, *supra*.

After some. thought, the only other consideration I can imagine which caused the Commission to accord such a minor weighting to reproduction cost is the fact that the rate of return allowed by it (6¼%) was very fair. This single factor seems wholly insufficient, however, to balance the disparity between a predominate weighting in favor of original cost as compared with a nominal weighting for reproduction cost in the determination of the rate base.

On the other hand, there are a number of persuasive reasons for a higher rate base. We are at the peak of a tremendous inflation begun 13 years ago which presently gives no indication of subsiding materially in the next few years. While construction costs have doubled and the Consumer's Price Index of the Department of Labor has risen 90%, many of the articles in common use today have risen 150%. Two general wage increases were granted by the Company subsequent to the filing of this rate application alone, for which the Company will get no relief no matter how successful this appeal. In order to afford wider and better service to over 8000 Delawareans who desire new service or a higher grade of service, the Company now, in this time of highly inflated prices, must embark upon a $10,000,-000 expansion program which will require substantial financing,

---

[37]In this connection, also, I believe that that portion of Justice Jackson's dissent in the *Hope Natural Gas* case quoted in 103 *A.* 2d 314, has pertinence.

either from American Telephone & Telegraph Co. or in the open market. Nor does the fact that this Company is a wholly owned subsidiary alter the picture, for no system such as American Telephone & Telegraph Co. will remain great if its subsidiaries are financially weak. Its strength is the combined strength of its subsidiaries, and, in my judgment, it is as necessary for this Company to be financially strong as though it were independent in fact. In recent years, it has had to dip into surplus on several occasions to meet its traditional dividend. Unless its rates are maintained so that it can meet without strain all operating expenses, pay reasonable dividends, add modestly to its surplus and attract new capital to finance its expansion programs, there will inevitably result a shrinkage of capital to a degree which could become serious.[38] After reviewing this entire subject, I

---

[38]Mr. Arthur H. Dean, the author of "The Impact of Changing Price Levels in Rate Making", *Public Utilities Fortnightly,* Dec. 23, 1953, predicts such a result on a nationwide basis unless the various Federal and State Utility Commissions take a more realistic view of the utility problem. Nor does the fact that he is a distinguished utility lawyer necessarily mean that he speaks with a forked tongue. He maintains that the real objectives of government regulation of Public Utilities are (1) reasonable prices, (2) fairness to investors, (3) ample supply of service and good service, and (4) ability to attract new capital. As to reasonable prices, he sarcastically remarks that if by "* * * 'reasonable' one means merely low, the Public Utility Commissions are to be commended." "But," he goes on to say, "Reasonable means neither too high nor too low; and a test of reasonableness should be comparison with the prices of comparable commodities of non-regulated industries. This test confirms the fact that * * * Public Utility Commissions have caused utility services to become underpriced." In this same connection, Mr. Dean shows that an investment of $100 in industrial stocks at average market prices during the period 1935-1939 would, as of April, 1953, have a market value of about $205, whereas a similar investment in utility stocks would be average $122.

Of capital shrinkage of utilities, he states "* * * this erosion of the utilities' capital has not notably curtailed the supply or impaired the quality of utilities' services, although the abnormally low current prices for their services has caused current demand to outrun the supply, while the expansion of facilities has perhaps been retarded by having to depend, almost entirely on the raising of new capital from investors instead of being able, like industrial companies, to finance a substantial part of needed plant additions out of retained earnings. Because adverse effects from capital erosion are not immediately felt does not mean, however, that such erosion will not impair, or is not already impairing the future ability of utilities to maintain the quality, supply and timeliness of their services." Mr. Dean is particularly critical of *Chesapeake & Potomac Tel. Co. v. P. U. C., Md.,* 93 *A.* 2d 249, so frequently cited on the Commission's brief.

have come to the conclusion that telephone service today is a bargain. There is no valid reason why a well-operated, efficient public utility should not be permitted to earn a fair return on the fair value of its plant and equipment. The man who today pays 150% more for his morning newspaper than in 1940 should not be heard to complain about an approximate 38% rise in his telephone rates.[39] Here, this Commission gave excessive weight to original cost and minor recognition to reproduction cost. In this day of inflated prices, common justice as well as the repeated decisions of the so-called fair value jurisdictions demand that predominate weight be accorded reproduction cost, or, in other words, to present, fair values.

I am well aware of the numerous authorities which lay down the cautionary principle that, in rate-making cases, a large measure of discretion is vested in the Commission. *New Jersey Bell Tel. Co. v. Dept. of Pub. Utilities,* 12 *N. J.* 568, 97 *A.* 2d 602, 613. From this, Commission counsel argues that while, under a fair value statute, it may amount to error for a Commission to give no weight whatsoever to reproduction cost, yet, having accorded a measure of weight thereto (in this case 12% of original cost), a Court will not set aside such an exercise of administrative discretion. *City of Pittsburgh v. Public Utilities Comm.,* 171 *Pa. Super.* 187, 90 *A.* 2d 607, 612.[40] While superficially plausible, this proposition does not stand closer examination. Accepted literally, this would mean that a Commission could, for all practical purposes, defeat the fair, present value

---

[39]"If the individual citizen unfortunately is compelled in these times to pay more than he did for everything he necessarily consumes, it should not be a subject of wonder that he must pay something more for his electric light than he did when wages were low, coal was cheap, etc." *Mercersburg Lemaster & Markes Electric Co. v. P. U. C.,* 1921, 76 *Pa. Super.* 58.

[40]The Penna. Court did say in that case, "The weight to be given any particular measure of value, such as original cost or reproduction cost, is for the Commission * * *." However, this Court went on to say "* * * but its action must be within the area of its administrative discretion and supported by the evidence." Moreover, the kind of original cost estimate used in Penna. is what is known as original cost trended. In other words, it is about the same in result as reproduction cost.

rule by the simple expedient of assigning 1% of weight to reconstruction cost and 99% to original cost. All would agree, I think, that a reviewing Court would have the power to examine into and set aside such an obvious subterfuge. Then why should it not have the power to scrutinize, and set aside if proper, a weighting of 2%, 5% or 12% to reproduction cost? As I see it, the question is not the power of the Court,[41] rather at what point the Court should exercise its power.

After a careful review of the record and applicable authorities, I conclude that the action of this Commission in according a weight of only 12% of original cost[42] representing reproduction cost was unjustifiable, for, in so doing, it substantially ignored the command of the authorities that it ascertain the fair, present value of the Company's property. Accordingly, the action of the Commission in fixing a rate base of $22,000,000 is reversed.

The important question remains, what is to be done? Three quarters of a year has already elapsed since the initiation of this proceeding. To remand generally to the Commission for further action might well result in additional hearings together with the necessary delay incident to a redetermination of this whole question by the Commission from which, conceivably, the Company might again feel obliged to appeal. The time lags involved in the determination of rate cases are unfortunate.

The Federal Courts have taken the view that they sit, not as a Board of Revision, but only to enforce constitutional rights. *Los Angeles Gas & Elec. Corp. v. Railroad Comm., supra.* Even so, they have taken upon themselves the widest powers in revising the decisions of Federal and State Commissions insofar as concerns rate bases. For instance, see *Missouri ex rel. Southwestern Bell Telephone Co. v. P. S. C.,* 262 U. S. 276, 287-288,

---

[41]"If we are to hold that a given rate is reasonable just because the Commission has said it was reasonable, review becomes a costly, time-consuming pageant of no practical value to anyone." Justice Jackson dissenting in the *Hope Natural Gas* case [320 U. S. 591, 64 S. Ct. 308].

[42]Or 10.15% on the rate base of $22,000,000.

43 *S. Ct.* 544, 67 *L. Ed.* 981. Moreover, Section 192 of Title 26 gives very broad powers to the Superior Court concerning the disposition of appeals. In part, it states:

"Upon every appeal the cause shall be determined by the [Superior] Court. * * * and the court may affirm, modify or revise the order of the Commission, in whole or in part, or may remand the cause to the Commission for rehearing, in whole or in part.".

The powers granted by Section 192 seem to be much wider in scope[43] than that upon which the Supreme Court of the United States has in the past based its appellate jurisdiction. The statute here, in addition to authorizing this Court to affirm or to remand, also grants the power to revise or modify. Both of these last mentioned words connote the right to change, to alter, to amend or to reduce. Other State Courts under similar statutes have reversed Commission findings and proceeded to make their own independent valuations from the record. *Solar Electric Co. v. Pennsylvania Public Utilities Comm.*, 137 *Pa. Super.* 325, 9 *A.* 2d 447, 469. I think this power should be sparingly used but, in a clear case, and in the interest of time and expense, should be exercised. Here, it is very clear to me that predominate weight should have been accorded reproduction cost and but a very minor weight accorded original cost. Accordingly, having reviewed all the factors presented in the record and the briefs, I shall make my own independent evaluation.

Contrary to the Commission's method of approach, I prefer basing rate base calculations, not upon original cost increased by some nominal, arbitrary percentage designed to reflect reproduction cost, but, rather, substantially upon reproduction cost[44] decreased by a percentage which ought fairly to

---

[43]Apparently, the power to review and revise as compared with the right in the Federal Court to examine the record in order to ascertain whether the rates so fixed were so inadequate as to amount to confiscation.

[44]Particularly in view of the fact that the Commission made no express findings in derogation of the Company reproduction cost study in this case.

compensate for errors inherent in any such study. Factors which among others would indicate that the Company's reproduction cost study should not be accepted at its face value are:

(1) The more liberal rate of return allowed by the Commission,—that is to say 6.25% as compared with 5.94% upon which the Company based its calculations.[45]

(2) The fact that a reproduction cost study, regardless of the care with which it is prepared, is an estimate.

(3) The fact that, due to technological improvements, the whole plant would not be reproduced in its present form.

(4) The fact that original cost as of April 30, 1953, which to the extent of plant and equipment installed subsequent to 1945 reflects in some slight measure the higher prices of today, is only approximately $20,000,000.

After weighing these factors, as well as other arguments advanced by the respective parties, I conclude that the adoption of a rate base of 90% of the Company's reconstruction cost study (April 30, 1953) or, in round figures, $25,500,000 should reasonably approximate the fair, present value of the Company's intrastate property. Certainly, the difference between this figure and the rate base reflected by the Company's study, approximately $2,900,000,[46] should amply compensate for any errors in the Company's reconstruction cost study. And this is particularly true because there was probably a sufficient cushion within this reproduction cost study itself to compensate for errors in judgment and the other factors above considered.[47] In accordance with the Commission's method of computation (using an arbitrary figure of $100,000 for cash working capital), and based upon the $6\frac{1}{4}$% rate of return, an increased net in-

---

[45]This is the equivalent of 4.96% on the Company's claimed rate base of about $28,400,000 or about $1,400,000.

[46]Actually about $1,500,000, using the more favorable return of $6\frac{1}{4}$%.

[47]I have already pointed out that the Company only charged $250,000 of interest on the construction fund, whereas it might have claimed $2,000,000 for that item alone.

come after taxes of about $590,000 annually is indicated. And if, hereafter, experience should demonstrate that the income based upon such a rate base is excessive, which I doubt, then it is always within the province of the Commission upon its own motion and upon hearing, to reduce the rates.

The Commission is directed to recompute its findings as directed and an order will be entered in the light of the views here expressed.