APPLICATION OF WILMINGTON SUBURBAN WATER CORPORATION and DELAWARE WATER CORPORATION for changes in Rates in accordance with Sec. 151, Title 26, *Delaware Code.*

(*June* 23, 1964)

WRIGHT, Judge, sitting.

*David F. Anderson* (of Berl, Potter & Anderson), for appellants.

■

*Joseph T. Walsh* and *J. Parker Connor,* for appellee.

Superior Court of Delaware, New Castle, No. CA 1314, 1962.

WRIGHT, Judge.

This is an appeal, under 26 *Del. C.* Sec. 192, from the findings, opinion and order of the Delaware Public Service Commission. The Wilmington Suburban Water Corporation and the Delaware Water Company filed separate applications for a change in rates pursuant to 26 *Del. C.* Sec. 151. The Wilmington Suburban Water Corporation sought an increase in its operating income in the amount of $134,438.00, an increase of approximately 35% over its present rates. Delaware Water Company sought an increase in its operating income in the amount of $107,357.00, an increase of approximately 50% above its present rates. The Commission suspended operation of the proposed rates and held public hearings. Thereafter, the Commission, by its findings and opinion, fixed the amount of the present fair value rate base, the rate of return on the rate base, and a fixed dollar amount of additional gross revenue for each of the companies.

Both Wilmington Suburban Water Corporation, hereinafter referred to as "Wilmington," and Delaware Water Company, hereinafter referred to as "Delaware," are public utility companies engaged in supplying water to customers in New Castle County. Delaware supplies industrial, commercial and residential customers and further supplies a substantial part of the water distributed by Wilmington Suburban Water Corporation. It also supplies water for resale to The Artesian Water Company, New Castle County Water Company, the City of Newark, and to a standpipe connection to the Town of Newport. Wilmington renders services to residential, commercial and industrial customers and also operates the facilities of Arden Water Company, hereinafter referred to as "Arden." The Commission consolidated the rate applications since an increase in rates granted to Delaware would substantially effect the cost of water to Wilmington. Originally,

Delaware was a subsidiary of the Philadelphia, Baltimore, and Washington Railroad Company, which in turn was a subsidiary of the Pennsylvania Railroad Company. It was formed in 1906 to furnish water to the railroad. Initially, its property consisted of an impounding, pumping and filtration facility on the Christiana Creek; two cast iron water pipe lines paralleling the railroad right of way; a storage system at Edgemoor and a standpipe at Bark Mills; and a supply line interconnecting the storage facilities in the railroad right of way. The Christiana station was converted to electrical power in 1926 and, in 1947, a new plant was constructed at White Clay Creek. In 1954, the properties were transferred to the Delaware Water Company. The Commission approved the transfer of the Delaware Water Company property to General Water Works Corporation, the present owners, in 1956. The General Water Works Corporation leased back the property to the Delaware Water Company. Since 1955, further improvements have been made to the existing facilities, namely, a 24" pipe paralleling the railroad right of way, a new treatment filtration plant at Stanton and further water main extensions.

The Wilmington Suburban Water Corporation was originally organized in 1934 to supply water to a limited area. Periodically, Wilmington acquired smaller water systems until, in 1941, it serviced an area between the distribution limits of the City of Wilmington system to the Pennsylvania border. The original source of supply was augmented by other sources, including a supply contract with the Delaware Water Corporation. To adequately supply increasing demands, Wilmington has augmented its storage facilities, power and pumping facilities, filtration systems, and transmission mains. In 1948, General Water Works Corporation purchased a controlling interest in Wilmington stock.

By a lease approved by the Commission in 1961, Wilmington also operates the Arden Water Company facilities. Arden was originally organized in 1913. Its facilities were expanded in 1924 when a dam was constructed on Naaman's Creek. Its source of supply was again augmented in 1953 by contract with Wilmington. Wilmington acquired a controlling interest in Arden in 1936. In 1948, the General Water

Works Corporation purchased a controlling interest in the outstanding shares of Arden stock.

In order to arrive at a fair and just rate base upon which to calculate a reasonable rate of return, the Commission attempted to ascertain the present value of the utilities' property currently in use. Accordingly, at the hearing the appellant utilities offered evidence of the measure of value of the utilities' property based on book cost, original cost depreciated and reproduction cost depreciated as evidenced by 1961 year end trended prices and 5-year average trended prices.

The state's witnesses attacked reproduction cost on the basis that price indexes do not give proper weight to increased labor productivity and technological advancements. The Commission then adjusted the accumulated depreciation on the utility plant in service and further discounted the companies' facilities and plants because of "supersession." According to this theory, an existing plant is reduced in value since it would never be rebuilt with the same materials, same design or the same method of construction, but would be built at present so as to provide more economy of operation. This being so it is unfair, contends the Commission, to compel consumers to pay rates based on the valuation, without consideration of supersession, of a facility which is outmoded though still in use.

Based upon the testimony of the state's witnesses, the Commission also adjusted certain operating income and expense accounts. The materials and supplies account was computed on the 5-year average balance as opposed to the companies' computation of this account on a 1961 year end basis. The companies' allowances for cash working capital were reduced to nominal sums. Other operating expenses and payroll increases and federal income taxes were adjusted by the Commission. At the hearing, the companies and the Commission stipulated that a fair rate of return would be a rate not exceeding 6% per annum. The rate of return granted by the Commission was less than 6% per annum for both companies, namely, 5.3% rate of return for Delaware and 5.72% rate of return for Wilmington. The companies now contend that since no evidence was offered on the fair rates of return,

these findings of the Commission were arbitrary and baseless.

The appellants argue at the outset that this Court may revise, modify, and change the findings and order of the Commission so as to conform with the evidence. This matter is raised principally for appellate purposes since it is conceded that this Court is bound by a contrary ruling of the Delaware Supreme Court. That Court has held that the Superior Court, in a case such as this, could not substitute its findings for the findings of the Commission. In re Diamond State Telephone Company, 10 Terry 203, 113 A.2d 437 (1955).

Thus, the following three general issues are presented on this appeal:

1. Do the rate bases, as found by the Commission to exist in the case of Delaware and Wilmington, allot proper weight to each element of value so as to represent the present fair value of the utilities property?

2. Are the rates of return as granted by the Commission on the present fair value of Delaware's and Wilmington's property sufficient to pay, in addition to the cost of production, a reasonable rate of return to its stockholders and some surplus for necessary expansion?

3. Did the Commission err in adjusting and normalizing certain operating income and operating expenses?

The Public Service Commission is directed to ascertain and establish a rate of return for facilities that will produce a reasonable return on the present fair value of the companies' property sufficient to pay, in addition to the cost of production, a reasonable return to its stockholders and some surplus for expansion. In re Diamond State Telephone Company, 10 Terry 203, 113 A.2d 437 (1955). As a starting point in determining a reasonable return, the Commission must establish a rate base to which a rate of return is applied. 26 Del. C. Sec. 126 provides:

"The Commission may, from time to time, ascertain and determine the fair value of the property of any public utility whenever, in the judgment of the Commission, it is necessary so to do for the purpose of carrying out any of the provisions of this chapter, and in making such valuation the Commission may have access to and use any books, documents, or records in the possession of any department or board of this State or any political subdivision thereof. In ascertaining and determining such fair value, the Commission may determine every fact, matter, or thing which, in its judgment, does or may have any bearing on such value; and may take into consideration, among other things, the original cost of construction, particularly with reference to the amount expended in the existing and useful permanent improvements; with such consideration for the amount in market value of its bonds and stocks, the probable earning capacity of the property under particular rates prescribed by statute or ordinance, or other municipal contract, or fixed or proposed by the Commission, and for the items of expenditures for obsolete equipment and construction, as the circumstances and the historical development of the enterprise may warrant; the reproduction costs of the property, based upon the fair average price of materials, property and labor, and the developmental and going concern value of such public service company; and these, and any other elements of value, shall be given such weight by the Commission as may be just and right in each case."

The Supreme Court has clearly set forth the matters to be considered in determining the fair value of a utilities property. The Court said in the case of In re Diamond State Telephone Company, 10 Terry 203, page 207, 113 A.2d 437 page 439 (1955):

"In determining what is 'fair value' several questions must be considered: first, the time as of which fair value shall be determined; secondly, the weight to be given to any and all of the different elements which the statute provides shall be considered in determining fair value; and, lastly, whether or not the rates fixed by the Commission will produce a fair and just return upon the reasonable value of the property used, or required to be used, in the service furnished to the public within this state."

In that case, the Court determined that the time when fair value was to be ascertained, was the "present time." However, it is clear that the Commission is not bound by any formula of valuation, nor is it required to give added weight to any individual element of value in determining present fair value. The Commission must merely "accord each element of value such weight as may be necessary and proper under the facts presented in each particular case." In re Diamond State Telephone Company, 10 Terry 203, 113 A.2d 437 (1955).

In the instant case, the evidence presented by the companies' and the Commission's witnesses placed the following valuations on Delaware's property:

| BOOK COST | | ORIGINAL COST | |
|---|---|---|---|
| Company | Commission | Company | Commission |
| $3,052,796.00 | $2,886,099.00 | $3,029,148.00 | $2,842,704.00 |

| TRENDED COST (1961) PRICES | | TRENDED COST (1957–61) PRICES | |
|---|---|---|---|
| Company | Commission | Company | Commission |
| $5,994,072.00 | $4,089,596.00 | $5,795,716.00 | $3,939,596.00 |

The Commission found the present fair value of Delaware's property to be $3,365,000.00.

The evidence placed the following valuation upon Wilmington's property:

| BOOK COST | | ORIGINAL COST | |
|---|---|---|---|
| Company | Commission | Company | Commission |
| $2,225,763.00 | $1,948,033.00 | $2,374,114.00 | $2,217,443.00 |

| TRENDED COST (1961) PRICES | | TRENDED COSTS (1957–61) PRICES | |
|---|---|---|---|
| Company | Commission | Company | Commission |
| $3,358,493.00 | $2,832,998.00 | $3,251,117.00 | $2,682,998.00 |

The Commission found the present fair value of Wilmington's property to be $2,362,000.00.

Reproduction cost is simply a method of establishing the cost of an existing facility or plant in terms of current prices. The actual costs of a facility are related to a current dollar cost of constructing the existing facility in a new condition and in a manner similar to that used by the companies in actually constructing its plant. In the present case, the companies inventoried their facilities in use and developed and projected the unit cost to the current price of material and labor rates, while establishing engineering and administrative overhead charges. Reproduction cost is established by applying property indexes to each component of the entire facility. The indexes are developed from labor indexes, price indexes for materials and equipment, and building cost indexes. A "trend factor" is derived from the index and used to multiply the dollar amounts for each component of the property. The Commission conceded that a trending process is a valid method of placing a valuation upon property but attacked the weight to be given to a trended index. Basically, the Commission contended first, that the cost of labor cannot be multiplied by a labor trend factor without proper allowances for increased productivity; secondly, that price indexes make no provision for technological advances in equipment and materials; and thirdly, that the components of an index are not necessarily related to the particular component of the physical property being appraised.

Reproduction cost estimates, as the Commission contended, are conjectural and based upon a multitude of opinions, estimates, and hypothetical conclusions.

However, the Commission must take into consideration and give proper weight to evidence of reproduction cost in determining the present fair value of the companies' plant in use. See In re Diamond State Telephone Company, 10 Terry 203, 113 A.2d 437 (1955), and In re Diamond State Telephone Company, 9 Terry 317, 103 A.2d 304 (1954). In the present case, the Commission placed great reliance upon

evidence tending to show a supersession factor in the appellants' properties. Supersession was defined by the Commission's witness, Mr. Martin Toscan Bennett, at page 405 of the record, as follows:

"A short definition of supersession is that it is the effect of the development of new materials, new products, new designs, and new methods of construction or fabrication which, because of their improvement over older materials, designs, and methods, have received acceptance by users and consequently have superseded such older products or methods. Supersession reduces the value of old property much as the advent of a new model of a car affects the resale value of old models. A trended cost valuation has to be discounted for supersession if it is to have any degree of reality as a measure of value."

It was contended that supersession was entirely distinct from the concept of obsolescence. At page 407 of the record, Mr. Bennett testified on this distinction as follows:

"Q. (Mr. Connor) What is the relationship between supersession and obsolescence?

"A. (Mr. Bennett) Supersession and obsolescence may result from similar forces, but not necessarily. Obsolescence can result, for example, from lack of need or use for an item as well as from technological progress, whereas supersession really applies only to the difference in what would be used today to perform the functions of an older item. Technological improvements hasten retirement of plant or shorten life, and consequently increase depreciation. Normally, an item becomes obsolete only when its replacement saves money—in other words, when the saving in costs resulting from using the new will pay for replacing the old over the life of the new. Supersession does not bring about retirement, but a superseded item would not be replaced with an identical item except under special circumstances."

Both supersession and obsolescence may be brought about by the same factors of technological advancement in equipment, construction, and materials. However, supersession relates to a

reduction in value of older property, whereas obsolescence refers to property that must be retired and replaced. Thus, supersession applies to all older property. Obsolescence applies to property whose value or usefulness is practically extinct. The Commission contends that a valid trended value cannot be ascribed to a facility or plant that would not be built at the present time in its present form, and further, that in order to determine the reproduction cost of the property, the total utility plant in service is discounted by the supersession figure and further adjusted for accumulated depreciation. This appears at page 636 of the record:

"Q. (Mr. Anderson) But it is something that is over and above the amount of the depreciation?

"A. (Mr. Bennett) Yes. After you have applied your supersession discount to plant, to say a trended cost to arrive at a present-day value, you still have to deduct depreciation from it."

The Commission placed particular weight upon evidence of supersession as applied to the companies' water mains. Reduced to its basic components, the Commission asserted that the existing 12 and 16-inch mains would not be installed under present-day conditions since a 20-inch main has a capacity equal to or greater than the combined total capacity of 12 and 16-inch mains. Thus, the existing facilities could not presently be valued to determine reproduction cost without proper allowances for contemporary construction methods and technological trends. To do otherwise, insists the Commission, would be placing an inflated value upon antiquated and outmoded properties.

In determining the reproduction cost, Mr. Bennett adjusted and discounted Delaware's property for supersession as follows:

| TRENDED COST 1961 PRICES | TRENDED COSTS AT 1957–61 PRICES |
|---|---|
| $1,311,000.00 | $1,270,000.00 |

| TRENDED COST (1961) PRICES | TRENDED COSTS 1957–61 PRICES |
|---|---|
| 442,000.00 | $450,000.00 |

The supersession discount was a lesser amount as applied to Wilmington's property since Wilmington's plant and facilities are of more recent construction. It is clear from the record that these supersession figures were neither acquired by any precise formula nor were they founded upon any precise and stable index. At pages 654–655 of the record, Mr. Bennett testified in cross-examination as follows:

"Q. (Mr. Anderson) Mr. Bennett, could you give me the breakdown by accounts of the amounts of supersession adjustments reflected in the last lines of Exhibits 22 and 23?

"A. (Mr. Bennett) Perhaps what I should say is that I will give you a breakdown of my thinking. I would not anticipate that any one of these figures was precise in any way, shape or manner. But if you wish, I will expand on how I arrived at that supersession discount shown on Exhibit 22.

"Q. Did you break it down by accounts or did you just lump it together in some fashion?

"A. No, I thought of a number of things, the pros and cons, and I put down some figures on a table, and then I considered depreciation and how depreciation will be affected by it, and I came up with the answer."

It is also quite clear from the record that the amount of supersession, as applied to any particular property, is merely a matter of individual judgment. At pages 658 and 659 of the record, Mr. Bennett testified on cross-examination as follows:

"Q. (Mr. Anderson) Mr. Bennett, if I understand you, this is largely a matter of judgment, as far as you are concerned, and not by the application of any formula or anything of that kind?

"A. (Mr. Bennett) Well, valuation is just full of judgments. The answer is yes, and I want to qualify that by saying the valuation is, of necessity, full of adjustments. It took judgment to pick the curves that Mr. Drury and I looked at. It took judgments to build those curves. It took judgment to take trends, and it took judgment to adjust those trends.

"Q. (Mr. Anderson) And is this correction that you made, that you have just been referring to in the round dollar amounts, does that include adjustment for errors?

"A. (Mr. Bennett) Yes."

The Commission's duty in evaluating such evidence has been set forth by the Supreme Court. In the case of In re Diamond State Telephone Company, 10 Terry 203, 113 A. 2d 437 (1955), at page 209 of 10 Terry, at page 440 of 113 A.2d, the Court said:

"Considering the language quoted from each of these sections in the light of the relationship of these sections to each other, we interpret these sections to mean that the Commission in giving proper weight to the evidence presented and in giving such consideration to the criteria of fair value as are 'just and right' shall accord to each element of value such weight as may be necessary and proper under the facts presented in each particular case."

A utility is not entitled to a return on a theoretical reproduction cost of a plant which would never be reproduced today in its present form because of obsolescence, but reproduction cost must be considered and proper weight given to it even though it is improbable that any plant would be reproduced in its entirety because of improved construction methods. *Scranton Steam Heat Co. v. Pennsylvania Public Utility Commission,* 194 Pa. Super. 143, 167 A.2d 693 (1960). The weight to be accorded to reproduction cost may be materially affected where there exists a high degree of obsolescence so that no reasonable management would reproduce a plant and facilities in their existing form. *Plainfield-Union Water Co. v. Board of Public*

*Utility Commissioners* 57 N. J. Super. 158, 154 A.2d 201 (1959); *City of Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Super. 38, 95 A.2d 244 (1953).

■ However, in the present case, the Commission neither attempted to prove actual obsolescence in the companies' property, nor in fact did it claim such obsolescence existed. It contended that supersession was neither equivalent to accumulated depreciation nor obsolescence. In fact, the Commission discounted reproduction cost for a theoretical depreciation which was termed supersession, after having deducted an allowance for accumulated depreciation. Theoretical supersession, however, is subject to the very same caveats that the Commission applied to the trending process, that is, it is based upon opinions, estimates, and personal judgments. The Commission's findings on the rate base in this particular case indicate that inordinate weight was given to the supersession discount. The evidence adduced by the Commission failed to show actual functional obsolescence. Quite to the contrary, the record, exhibits and the testimony clearly indicates that business has increased in the past and will continue to grow in the future. Also, the evidence indicates that the sales and consumption of water has accelerated over the immediate past. This continued consumer demand has created a necessity for future expansion of plant facilities.

■ Moreover, the evidence relating to new materials and construction methods was not related with any accuracy to the properties of the particular utilities being valued. Illustrations cited before the Commission relating to new equipment and materials currently in use in construction projects were not shown to have any direct and immediate relationship to the utilities whose case was pending before the Commission. By way of example, the Commission received extensive evidence on the qualities, properties, and usage of plastic water piping. However, the record indicates that plastic piping has not been widely and extensively used by water utilities. Such piping at the present time is in a developmental stage. It is inconvincing to argue that a property in use should be discounted because of the discovery of an experimental product.

As stated above, the Commission discounted the companies' water mains accounts for supersession. In determing the reproduction cost of a utility only the property of the utility may be valued. The Commission may not substitute different materials, equipment and facilities in place of the actual existing materials, equipment and facilities of the utility. *Chesapeake and Potomac Telephone Co. of Baltimore City v. Public Service Commission,* 201 Md. 170, 93 A.2d 249 (1952). Although the Commission claimed it discounted the water mains accounts for supersession, it in fact substituted and valuated a property other than that in use by the companies.

Of course the Commission may not disregard evidence of mechanical and physical depreciation, the age of a property which results in increased maintenance costs or operating costs, the nonuse of the property, or the functional obsolescence, all of which may affect a proper valuation. However, the dollar and cents value placed upon the supersession discount lacks any proof in fact and reality.

Next, the Commission points out that the accumulated depreciations applied to the reproduction cost figures are an exact 39.9% discount. This percentage figure was formulated by taking the companies' estimates of reserve requirements and deducting it or its trended counterpart from the value of the utility's property for the purpose of arriving at a rate base. However, the amount of depreciation to be deducted from the reproduction cost is not controlled by any theoretical formula. It should be determined by a careful consideration of the actual facts. Accumulation depreciation is not measured by a depreciation reserve fund set up by a utility, since such a fund does not necessarily represent actual depreciation. In *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Super. 341, 144 A.2d 648 (1958), the Court said:

"In arriving at a fair value based upon the respective measures of value in a rate proceeding, the commission is required to ascertain the actual depreciation of the utility's property as it has accrued to the date that fair value is in issue."

A book depreciation reserve is accumulated by an application of a certain percentage to the book cost figure of a plant and is based upon an average life span of the different elements within the plant. The depreciation reserve does not necessarily represent or have an exact relation to actual accumulated depreciation for rate base purposes. Therefore, a depreciation reserve set up on a utility's books is not binding on a commission and should not be arbitrarily used as a formula to determine accumulated depreciation. *Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Super. 409, 89 A.2d 903 (1952). The Commission may properly consider evidence of a book depreciation reserve in its considerations, but should not use such a figure as a sole determinant of accumulated depreciation.

The apparent purpose and effect of a supersession discount is to dilute the value of reproduction cost in determining the present fair value of property. The Commission claims compliance with the statutory requirement of extending proper weight to reproduction cost in computing the present fair value rate base, but ignores the fact that a fair value rate base must accurately reflect actual accrued depreciation. The rate base, as computed by the Commission in the instant case, is based upon an arbitrary discount for an ambiguous supersession value and a formula founded upon the companies' book depreciation reserve. Thus, the Commission did not give proper weight to reproduction costs, and its findings, as to the present fair value of the utilities property, are not "just and right."

The appellants included an allowance for cash working capital in the book rate bases. In the case of *In re Diamond State Telephone Co.,* 1 Storey 525, at pages 528–529, 149 A.2d 324, at page 327 (1959), the Court defined "cash working capital" as follows:

"* * * 'Working capital * * * is an allowance for the sum which the company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently.' Barnes, Economics of Public Utility Regulation (1947) p. 495." (Emphasis supplied.)

Cash working capital is included within the rate base as an addition to the fair value of a utilities property currently in use and as an addition to an allowance for materials and supplies. Delaware contended that an allowance of $10,000 was required as cash working capital. Wilmington contended that an allowance of $53,975 be allotted for cash working capital.

A need for cash working capital may arise because of a time lag between payment of a company's expenses and the receipt of payments by a company for services rendered. Before an allowance for cash working capital is made in the rate base, it must be shown that a need for it exists in each particular case. If, in fact, there is no requirement, there is no need to make an allowance for cash working capital. The Delaware Supreme Court has held that monies presently collected and held by a utility for payment of future tax liabilities may be set off against its needs for cash working capital. In re Diamond State Telephone Co., 1 Storey 525, 149 A.2d 324 (1959).

In that case, the Commission also had adopted an "alternative fund theory" and disallowed an allowance for cash working capital. However, the Court reversed the Commission's finding that book account entries for customers' deposits and accrued billing and payments could be adopted as alternative funds in place of an allowance for cash working capital.

In the present case, the evidence before the Commission showed Delaware to be on a monthly billing basis for approximately 90% of its accounts, most of which are industrial accounts. Delaware's contention that a $10,000 allowance was required for cash working capital was based upon an alleged necessity to maintain a minimum bank balance. Apparently, Delaware considered this allowance as a security for emergency and unforeseen cash needs. The Commission's witness contended that the company's books indicated that Delaware's associated companies were indebted to Delaware at the end of December 1961. If, then, the company collected these accounts receivable, no allowance for cash working capital would

be required. However, a public utility commission should not dictate business practices to be followed by a utility. A company is not required to liquidate all accounts receivable at the end of each year. Such an account is merely an accrued billing which may not be set off against cash working capital. At any rate, the Commission allowed $5,000 as cash working capital. Since the company showed no need for cash working capital and requested merely allowance for a minimum bank balance, the Commission was not required to make any allowance whatsoever. In its discretion, the Commission did make an allowance for a nominal cash working allowance to meet emergency needs. It appears that such an allowance is properly within the Commission's discretion.

Wilmington requested an allowance for cash working capital based upon an arbitrary formula, by computing one-eighth of its adjusted operating expenses, excluding, however, an amount for depreciation and taxes. The resulting sum totaled $53,975.00. The Commission's witness recommended a much smaller allowance. By taking a five-year average of the company's cash working capital accounts, it was ascertained that $11,745.00 was the average five-year balance in this account. Also, the record discloses that at the end of the 1961 test year, Wilmington's cash working capital account contained $8,500. The Commission compromised these figures to an allowance of $10,000.

While the Commission was correct in refusing to take cognizance of the company's arbitrary formula, it appeared that neither Wilmington nor the Commission made any study of the time lag between collection of tax monies and the payment of tax liability. If such a lag existed, it may be used as a set-of against cash working capital. The evidence shows that Wilmington, unlike Delaware, is not on a monthly billing cycle. Thus, there may exist a more pressing need for an adequate allowance of cash working capital. The Court has no evidence of the company's requirements for cash working capital. Since there is a difference of approximately $43,000 between that which the company requested and that which the Commission allowed for cash working capital, the Commission should review this matter further to

determine, first, if there exist any monies in the company's accounts which may be set off against a need for cash working capital and, second, if there in fact exists a need for cash working capital.

In determining the present fair value rate base, the companies included an allowance for materials and supplies. As of December 31, 1961, Delaware carried $51,490 in an account entitled "Materials and Supplies." On the same date, Wilmington's Materials and Supplies account showed a balance of $63,965. The companies contended that these accounts represented invested capital upon which they were entitled to earn a return and that the full amount of these accounts should be used for rate base purposes.

The Commission contended, first, that these balances could be controlled by the companies and, second, that the amounts in these accounts in December of 1961 were excessively larger than the amounts carried in these accounts for the years 1957 through 1960. For example, Wilmington's Materials and Supplies account in December of 1960 reflected a balance of $25,110.55, a difference of $38,854.83 as opposed to the balance in December of 1961. There was no dispute whether, in fact, the book balances accurately reflected the Materials and Supplies accounts themselves or whether these accounts accurately represented the utilities' condition at the end of the 1961 test year. The Commission did find that such an unusually large amount should not be used in determining future rates. The Commission computed the five-year average balance in these accounts and concluded that the resulting figure was a more "appropriate" allowance for materials and supplies, since the 1961 balances reflected an unusual condition for which there was no apparent or obvious reason. In the Commission's findings, an allowance for materials and supplies was made as follows: Delaware, $27,695; and Wilmington, $34,209.

A Materials and Supplies account should represent tangible assets presently on hand to be used at a future date for construction purposes and for normal maintenance and operation requirements. A portion of the increased balances in these accounts for the year 1961 was attributed to chemicals for water treatment. Until

the year 1960, the utilities had charged these chemicals to an expense account as they were purchased. For the years 1960 and 1961, chemicals were charged to the Materials and Supplies account at the time of their purchase and later carried on the companies' books when the chemicals were consumed. Also, there is some evidence to indicate that the companies are increasing their use of chemicals in water treatment.

However, the companies also contended that the increased balances in these accounts for the year 1961 also reflected an increased inventory on hand for construction purposes. Upon close cross-examination by the Commission, the companies' witness admitted that these accounts had not been inventoried and no reasonable explanation was offered either as to the actual materials within the accounts or the necessity or propriety of the balance as contrasted with the balances of preceding years. Thereafter, the appellants made no attempt to present further evidence on these accounts.

For rate making purposes, the Commission should take into consideration the latest available figures of a utility so long as such book entries accurately represent the present condition of a company. However, a book entry does not establish its own reasonableness or propriety merely because it exists. While there is a degree of managerial discretion as to the amount of materials and supplies necessary to insure proper maintenance of the companies' facilities and to fulfill future construction requirements, the Commission has the right and the duty to judge and determine the necessity of the inventory carried by a company based upon its average needs. *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 163 A.2d 762 (1960); *Berner v. Pennsylvania Public Utility Commission,* 177 Pa. Super. 19, 107 A.2d 882 (1954).

In the present case, the Commission correctly pointed out a substantial increase in the material and supplies accounts for both Wilmington and Delaware in the test year of 1961. Historical experience of these companies does not indicate that the amount of the

balances in the companies' accounts is necessary to meet the needs of the companies. The companies have offered no evidence of past average needs, no evidence of present requirements, and no evidence of immediate or foreseeable requirements to justify or explain the alleged present inventory of its material and supplies account. The Commission thus availed itself of a concrete figure based upon the approximated average needs of the companies by computing the five-year average balance in the material and supplies accounts. In *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission,* 186 Pa. Super. 1, 140 A.2d 114 (1958), the Court affirmed the Commission's allowance of a reasonable amount for material and supplies by computing the five-year average balances in that account. Since the companies here failed to demonstrate by any substantial evidence that this inventory was required to meet necessary maintenance requirements or construction projects, the increases fall into the category of surplus property or surplus inventory upon which the companies are not entitled to earn a return.

At the time of the hearing, the Commission and the companies entered into a written stipulation, which the Commission subsequently approved, that a fair rate of return would be a rate not to exceed 6% per annum and that no further evidence of a fair rate of return need be offered in the proceedings. The stipulation provided as follows:

"It is hereby stipulated by and between the attorneys for Wilmington Suburban Water Corporation and Delaware Water Corporation and the attorneys for the Commission, subject to the approval of the Commission, that the fair rate of return on each of the said company's rate base to be determined by the Commission in this proceeding shall not be more than six per cent (6%) per annum and it shall not be necessary in this proceeding to offer evidence or other proof of the fair rate of return."

A stipulation is, in effect, an agreement or admission made in a judicial proceeding by the parties thereto in respect to same matter incident to the proceeding for the purpose of avoiding delay,

trouble, and expense. 50 Am.Jur., Stipulations, Sec. 2, pp. 605, 606.

In its findings and opinion, the Commission held that Delaware was entitled to a rate of return of 5.3% and Wilmington to a rate of return of 5.72%. The appellants now contend that the Commission's findings as to the rate of return [are arbitrary and baseless, having no foundation in the evidence. The appellants further argue that since it was agreed that a rate of return] up to 6% was reasonable and no evidence was specifically offered to show what in fact a fair rate of return would be, then the Commission must find 6% per annum as the reasonable fair rate of return. The Commission, however, points out that the effect and purpose of the stipulation was to set a ceiling on the rate of return at 6% and in no way compelled a finding that 6% was the proper rate of return.

It is clear that there was in fact no meeting of the minds either as to the scope of the stipulation or as to its proper interpretation. In the instant case, both the Commission and the companies completely disagree as to the meaning and effect of this stipulation. Because of the fundamental disagreement as to the purpose, intent, and interpretation of the stipulation, the Court will not read into it something that does not clearly appear on its face.

In State, to Use of *Henderson v. Clark,* 2 Terry 246, 41 Del. 246, 20 A.2d 127, 138 A.L.R. 704 (1941), a former sheriff sought to recover damages for the failure to produce certain cumbersome property that had been levied upon. The issue raised by the evidence was whether the sheriff exercised reasonable care in the keeping and safeguarding of the property. The parties there had stipulated that the sole question before the Court was a determination as to whether negligence existed on the single fact of the sheriff's failure to place a watchman over the property. The Supreme Court of Delaware, however, set aside the stipulation as being improvidently stated and misleading, saying that the answer to the issue of whether the sheriff was negligent in performance of his duties was to be found from a consideration of all pertinent and relevant facts and not from a single fact. The only reasonable conclusion here is that the stipulation

between the Commission and the utilities in the present case is misleading and improvidently entered into. The answer to the question of what constitutes a fair rate of return must be based upon all facts relevant to that determination.

Moreover, it is unwise in a utility rate case for the Public Service Commission to enter into a stipulation which could be construed or argued as a stipulation on an ultimate issue of fact. All utility rate cases are subject to an overriding public interest, since the Commission must regulate the rates chargeable by a legalized monopoly. The general public must ultimately sustain the burden of the rates. Thus, the Commission, as an administrative agency, represents the state and the public in all matters properly before it. It stands between the public and the utilities. Before a commission makes a finding upon an ultimate issue of fact, public policy requires that the public interest be protected either by a full hearing on all the evidence relating to that issue of fact or that the basis of the Commission's findings clearly appear in the record.

Also, the findings and opinion of the Public Service Commission are subject to judicial review. 26 Del. C. Sec. 192. On appeal, the Court must determine whether the Commission's findings are contrary to the weight of the evidence. If there is no proper evidence in the record, the Courts, on the review, have no means of determining whether a finding is contrary to the weight of the evidence or whether the public interest has been properly protected.

The Commission points out that the companies' exhibits received into evidence at the hearing indicate that the rate of return sought by Delaware was 4.55%, and that sought by Wilmington was 5.53% and therefore the percentage of return granted by the Commission was in excess of the percentage figures actually sought by the companies. On the other hand, the appellants contend that they did not seek a specific rate of return, but rather a specific dollar revenue. However, the parties lose sight of the fact that both the rate of return and the dollar revenue returned are important and that while some of the same considerations apply in arriving at both results there are also independent standards to consider. The Supreme Court of Delaware has

stated that the dollar return must allow a company to meet all its operating expenses and pay a reasonable return to its stockholders with some surplus for necessary expansion. In re Diamond State Telephone Co., 10 Terry 203, 113 A.2d 437 (1955).

Any findings on a fair and reasonable rate of return should be based upon competent evidence of the cost of capital to the particular utility petitioning for a change in rates. In *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa.Super. 376, 126 A.2d 777 at page 781 (1956), the Court defined "cost of capital" as follows:

"Cost of capital is the determination of a percentage, based upon the factual evidence, of what it will cost a utility to obtain debt and equity capital. The best evidence of this relates to the recent past; this was considered here. The rate of return is determined to operate in the future. The market admittedly fluctuates constantly. The best evidence, if not the only reliable evidence for these purposes, is the experience of the past. A prediction of a future market in the guise of an exercise of judgment is unwarranted. The judgment embodied in the function of rate making, which is a legislative power, is not of this nature; it is a judgment to be exercised by the commission upon the facts presented."

Where the cost of capital has been properly determined, the Commission must also give proper consideration to the utility's financial structure, its credit standing, dividends, interest, risks, regulatory lags, wasting assets, and any other peculiarities of the company involved. *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa.Super. 1, 140 A.2d 114 (1958).

Where the utility is a subsidiary of a parent holding company, the Commission must not ignore the actual capital structure of the holding company, since any advantage that inures to the benefit of a utility in obtaining money should also benefit the public as well. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Super. 376, 126 A.2d 777 (1956). Since debt capital is contractual in nature, the historical cost of debt can be determined by looking to the

historical experience of the utility, but there is no contractual basis for determining the cost of equity capital. This must be determined by means of a broader inquiry. Although the Commission should determine the actual capital intercorporate structure of the subsidiary and parent corporation, the Commission must determine more than the mere characteristics existing at a given date, since rates must operate in the future. In *New England Telephone and Telegraph Co. v. State,* 104 N. H. 229, 183 A.2d 237 (1962), the Court in that instance pointed out that neither the utility nor the public should be penalized by the debt structure of a utility. At page 243 of 183 A.2d, the Court stated:

"* * * that because the debt ratio substantially affects the cost of obtaining new capital, the Commission can legally determine a rate of return upon a capital structure different from that actually existing."

The Commission should not construct an "ideal" capital structure that has no relation to the particular facts before it; and while historical cost of capital should be considered, it is not controlling per se, since the cost of capital is based on the recent past merely as a guide to obtain debt and equity capital in the future. The Commission should make necessary adjustments to bring the capital structure to be used for rate purposes in accordance with one that is fair and reasonable.

In the instant case, the stipulation entered into between the parties specifically stated that a fair rate of return would not exceed 6% per annum. This was neither an agreement as to the percentage rate of return nor a guide to its discovery. Also, the stipulation further stated that no evidence need be offered on the fair rate of return. In its brief before this Court, the Commission turned to the exhibits submitted by the companies for computing interest deductible for federal tax purposes and attempted to construct the capital structure of the companies on that basis. The record is devoid of any other competent evidence upon which the Commission could make proper findings on a percentage rate of return. The Commission, in its findings, opinion, and order, made no reference to the capital structure or cost

of capital in determining the fair rate of return. The Commission's findings were based upon computations as to "return earned." This situation arose because of the improvident and misleading stipulation whereby the Commission was forced to reconstruct the capital structure of the company without reference to a full hearing on the cost of capital. This Court can make no determination on the issue as to whether the Commission's finding on rate of return is against the weight of evidence, since no evidence was offered at the hearing on this matter. Therefore, this issue is remanded to the Commission so that proper evidence may be adduced on the capital structure of Delaware and Wilmington and their parent company, General Water Works Company; on the cost of capital to Delaware and Wilmington, giving proper consideration to debt capital and equity capital; and on proper adjustments to be made to bring the capital structure used for rate purposes in accordance with one that is fair and reasonable.

The appellants place great weight upon the case of *Salisbury Water Supply Co. v. Department of Public Utilities,* 344 Mass. 716, 184 N. E. 2d 44 (1962), where the Court held that rates of 6.5% and 6.0% granted by the Massachusetts Commission were inadequate. However, a percentage rate of return figure must be based upon the particular facts, circumstances, and evidence presented in each particular case. A rate of return applicable to some other utility may not be adopted as a basis for a rate of return. A Commission may properly consider such evidence, and applicants before a Commission may properly offer such evidence, if it is shown to bear some probative value to the case under consideration. For example, rates of return currently in use by other water companies in an adjacent area may be of value if the circumstances of those water utilities are similar to the company's that is petitioning for a change in rates. However, the only apparent relevancy of the Salisbury Water Supply Co. case is to show that the rate of return of some other water company exceeds 6%. This has no probative value in the instant case.

The appellants next contend that the Commission erred in arbitrarily "adjusting" and "normalizing" certain operating income and expenses and in computing the companies' federal income tax

liabilities for the test year 1961. The Commission cannot arbitrarily disallow an actual, existing operating expense incurred by a utility during the test year. Thus, in the case of *In re Diamond State Telephone and Telegraph Co.,* 9 Terry 317, 103 A.2d 304 (1954), the Court held that the Commission could not exclude the effect of a wage increase granted by a company during the test year. The Court said:

"Thus, the rule is that for rate-making purposes, a Commission must consider and allow the normally accepted operating expenses of a utility corporation unless found to have been made in bad faith or out of an abuse of discretion."

Again, in the case of *In re Diamond State Telephone Co.,* 1 Storey 525, 149 A.2d 324 (1959), the Court held that the Commission could not arbitrarily disallow an actual expense based upon a theory of reforming the capital structure of a corporation. However, the Commission's findings should not be based upon a non-recurring expense or non-recurring income, a windfall. *In re Diamond State Telephone Co.,* 9 Terry 317, 103 A.2d 304 (1954). In *City of Cincinnati v. Public Utilities Commission of Ohio,* 161 Ohio St. 395, 119 N. E. 2d 619 (1954), the Court stated:

"* * * It is the universal rule that non-recurring expenses must be disallowed in their entirety or amortized over a reasonable period."

Thus, operating expenses, which are the cost of producing services, in the absence of waste, inefficiency or bad faith should prevail over estimates of experts since it represents the actual experience of a utility. However, the appellants in their briefs appear also to advocate an allowance for certain estimated future expenses. At page 18 of the brief, the appellants argue as follows:

"In the case of *Diamond State Telephone Co.,* 1 Storey 525, 149 A.2d 324 (1959), the Delaware Supreme Court said that the allowance of legitimate expenses presents no problem for the exercise of judgment by the Commission, and that the Commission was required to allow expenses which *would* be incurred. However, in this case, the

Commission followed the testimony of its witness McLean in making arbitrary adjustments concerning the expenses which *would* be incurred by the companies." (Emphasis supplied.)

The case cited by the appellants concerned only actually experienced operating expenses and not forecasted operating expenses projected into the future by estimates of experts. Therefore, the case cited by the appellants does not specifically hold that expenses, which may be incurred in some future year other than the test year, be allowed as operating expenses.

Ordinarily, in order to determine operating expenses, the Commission looks to the test year since the recorded past is used as a basis of determining estimated future operations. However, when the past ceases to be relevant, then it should be discarded. If immediate facts are present and ascertainable but not recorded in the past, the Commission should consider these.

The Commission excluded $20,000 of general and administrative operating expenses for Wilmington which were incurred during the test year 1961. The record shows that Wilmington operates its plant and facilities from the Claymont offices. These same office facilities and the same supervisory and office personnel are utilized by Wilmington as well as several other subsidiaries of General Water Works Corporation in the operation of their plants. Claymont then is the operational headquarters for many water companies doing business in the area, both in Delaware and Pennsylvania. Sometime in the year 1960 and during 1961, a new accounting system was initiated in the Claymont offices. As a result, the payroll administrative expenses of the Claymont offices were allocated to the several companies on a time sheet basis. Prior to the test year, each company in the Claymont offices bore its pro rata share of the expenses equally. During 1961, while this time sheet allocation system was utilized, Wilmington sustained a substantial increase in its administrative and general account. The Commission found this increased amount to be excessive and abnormal and thus reduced the account by $20,000. However, at page 605 of the record, Mr. McLean testified as follows:

Mr. Anderson

"Q: Did you find in your examination of the books and records any items of expense which were not actually incurred in 1961, which were shown on the company's exhibits?

Mr. McLean

"A: Not to my knowledge.

"Q: In other words, the figures which appear on the company exhibits reflect their actual experience during the year 1961, as far as the books of the company are concerned?

"A: As far as I know, they do. I understand the books are kept in accordance with the prescribed system of accounts, with which I am barely familiar."

Thus, the Commission concedes that Wilmington's 1961 payroll and administrative figures are accurate and represent an actual operational expense. The only basis that is offered for normalizing this expense is the increased amount in the account as compared to prior years. It is argued that the account is not representative of normal yearly operating expenses that will be experienced in the future. However, the record clearly shows that the increase in this account was attributable to the consolidation of several accounts into the administrative and general account during 1961 and an increase in actual work performed in the operation of Wilmington's business. The Commission failed to establish that the increased amount was attributable to waste, inefficiency, or bad faith. While the mere actuality of an operating expense does not establish its reasonableness or necessity, on the other hand a mere increase in expenditures does not necessitate an adjustment. Since the amount in this account represents the legitimate cost of the administrative and general expense in the test year, the account should not be adjusted and the $20,000 should be allowed as an operating expense.

The appellants also argue that the Commission erred in disregarding the annualization adjustment of payroll expenses and fringe benefits not incurred in the test year 1961 but which became effective on January 1, 1962. At page 89 of the record, Mr. Albert F. Eckelmeyer testified on behalf of the companies as follows:

"* * * It will be noted that consideration has been given to the expected additional payroll expense to be charged to the company by Wilmington Suburban Water Corporation in reimbursement for work performed by its personnel, and that the net adjustment is the result of an expected increase in Wilmington Suburban's payroll and in expected decrease in the payroll of Delaware Water Corporation. * * *"

The witness continued by saying that the pro forma payroll had been distributed to the accounts of both companies in proportion to the actual experience of the companies in the test year. The Commission's witness and the Commission in its findings and opinion made no allowance for the anticipated increase in payroll expenses not incurred during the test year. At page 622 of the record, Mr. E. Edward McLean testified as follows:

Mr. Anderson

"Q: Mr. McLean, you didn't consider these payroll adjustments that we are incurring now in 1962 that became effective the first of the year, did you?

Mr. McLean

"A: No, sir. They did not occur in 1961.

"Q: But we know that we have them this year, don't we?

"A: Yes. I assume that certain of your expenses on an over-all basis are going to go up. How much is going to remain in the books of Wilmington Suburban I do not know. I do not know, either, how much your revenues are going to go up, but I think they are going to go up. It

would be grossly improper to take only the minuses; that is, the expenses which you can foresee and not the revenues which you can also foresee."

In essence, the Commission contended that it is improper to project the increased cost of labor as evidenced by payroll expenses, without computing or considering revenues derived from increased rates, new customers, and expanded consumption.

The fluctuation in Wilmington's operating account demonstrates that a payroll increase, which does not take effect during the test year itself, will not necessarily result in a fixed and determinable future expense. Thus, in regard to Wilmington, while there may be an increase in the hourly payroll wages, the proportionate expense will vary from year to year since the operational expense is allocated to various companies on a time sheet basis. An hourly wage increase then will not necessarily result in an ascertainable total payroll escalation, nor will it necessarily result in an increase which can be accurately forecasted. However, it is evident that there will be some increase in operating expenses. There is also no guarantee or assurance that the number of employees on the companies' payrolls will remain static, neither increasing nor decreasing. Both Delaware and Wilmington appear to base their request for an allowance of payroll expenses not sustained during the test year upon a contention that the payroll rate was increased in the year 1962 at the rate of 8.7%. Thus, they project this rate and pro rata it to their estimates payrolls.

In the case of *In re Diamond State Telephone Co.*, 9 Terry 317, 103 A.2d 304 (1954), the Court there held that the Commission must allow wage increases that become effective during the test year itself. The Court also stated at page 347 of 9 Terry, in Footnote 26, at page 322 of 103 A.2d:

"There is authority for the proposition that wage increases becoming effective during the rate hearing itself may be considered and taken into consideration. *City of Philadelphia v. Pennsylvania* P.U.C., 162 Pa. Super. 425, 57 A2d 613. I do not understand that the company

takes this position as to the second wage increase which it incurred during the course of the hearing."

In *City of Philadelphia v. Pennsylvania* P.U.C., cited supra, the Commission, during the hearing, heard evidence and testimony concerning a basic wage increase that was being negotiated between the company and the union at the time of the hearing. All the parties knew that the existing labor contract would expire. A new wage contract which greatly increased the companies' expenses was entered into shortly after the final hearing. The Court there held that the Commission, without further hearings, properly considered the wage labor contract as new evidence and properly adjusted the companies' operating expenses to conform with the wage labor contract. The wage increase in the instant case took effect immediately following the test hearing adopted by the Commission, but prior to the hearings on the tariff increases. Thus, the new wage levels were a known expense which superceded past experience and made it obsolete.

The test year cannot be an inflexible and arbitrary cut-off period when present experience demands that more recent and more pertinent data be considered. In not considering the effect of a known and present operating expense, the Commission erred. Operating income and the expected increase in revenues cannot be computed upon obsolete payroll levels. The Commission contends that the increased revenues, accruing to the companies by reason of the new tariff levels, will offset any known increase in operating expenses. However, the rate of return must realistically be based upon the present operating experience of the companies. In this case, the companies' claim of a payroll increase of 8.7% is unrebutted and unrefuted.

The appellants next contend that the Commission erred in refusing to allow an advancement in operating expenses for increases in payroll taxes, annualization of insurance costs, and annualization of employees' welfare expenses and pensions, all of which are predicated upon the payroll wage increase. The record shows that the employees of Delaware and Wilmington are covered by a group insurance and hospitalization contract and a pension plan. The insurance and pension

benefits are proportionately expanded with the basic pay wage increase. The rate and cost of welfare benefit coverages and the rate and cost of pension plan contributions are based upon the salary levels existing at the time of the pay scale increase. Thus, these operating costs will be a known expense that is reasonably ascertainable, being based upon contract rates. The Commission then should allow an adjustment for the increased operating expenses resulting from welfare benefits and pension rates.

The Commission, to the extent that such figures are ascertainable, should also allow the companies adjustments for increased operating expenses in known insurance rates and payroll tax rates. These expenses are also predicated upon the payroll wage increases and are a known operating expense. It is recognized that it may be difficult to ascertain the amount of withholding taxes, unemployment insurance coverages, and other expenses, since they are based upon an individual's salary. However, to the extent that such costs can be ascertained with reasonable certainty, and without speculation, they should be allowed.

The appellants next contend that the Commission made no adjustment for real and personal property taxes payable upon the plant in service in the test year. The law is clear that taxes are a deductible operating expense. At 43 Am. Jur., Public Utilities and Services, Sec. 143 Taxes, page 667, it is stated:

"In general, validly imposed taxes are properly included in the operating expenses of a public utility for rate-making purposes, and are to be deducted from the gross revenue of the utility in determining whether the net return is fair."

The Commission disallowed Delaware's claimed adjustment of $3,730. Delaware's exhibit on operating income shows the status of the real and personal property account as follows:

| | "Actual 12 Mos ended 12/31/61 | Estimated Future | Adjustment |
|---|---|---|---|
| "Real & personal property | $12,877 | $16,607 | $3,730 |

"The real and personal property tax is based on the actual tax bills for the 1961–1962 period and the estimated tax for major additions to the plant."

Thus, Delaware's adjustment is a claim for estimated taxes based upon expected expansion to the plant actually in service during the test year. Similarly, Wilmington's Statement on Operating Income demonstrates that the real estate tax actually accrued for the twelve months ending December 31, 1961 was $18,824. Wilmington's estimated future real estate tax was computed at $23,414. Thus, Wilmington claimed an adjustment of $4,590 was required. However, the Commission correctly disallowed Delaware's adjustment of $3,730 and Wilmington's adjustment of $4,590. Such adjustments were mere speculation and not based upon a known, ascertainable change in operating conditions. The Commission correctly allowed only those taxes levied upon the plant in service for the benefit of the customers during the test year.

The Commission then accepted as a depreciation expense the amounts claimed by the companies in their operating statements as depreciation on the plant in being for the test year 1961. Thus, Wilmington was allowed $45,861 as a deduction from operating income for depreciation although the company had adjusted this figure to the decreased amount of $43,729 in its future estimates. Delaware was allowed $42,370 as a depreciation expense. The company adjusted this figure to $49,393 in its future depreciation estimates by projecting a depreciation allowance for plant not in being in 1961.

A depreciation expense allowance, in fixing utilities rates, should compensate the company for losses from the market value of the property, not restored by current maintenance, which is due to all factors causing the ultimate retirement of the property. The single

question presented on review of the Commission's findings is whether the amount allowed by the Commission affords adequate protection to the utilities' depreciation reserves. Since the amounts allowed by the Commission in the depreciation accounts of Wilmington and Delaware represent the annual depreciation in the plant in service during the test year, adequate protection is afforded. The evidence presented at the hearing does not support a depreciation allowance in excess of the annual depreciation requirements of the companies on the plant in being during 1961.

Lastly, the appellants contend that the Commission's computation of federal and state income tax was erroneous. In regard to Delaware, the appellant contends that the Commission incorrectly used the company's operating expenses, exclusive of depreciation and income taxes, actually experienced in 1961 in the amount of $242,908.00. The normalized operating expenses, that is, the expenses adjusted for rate-making purposes, were $232,419.00. The Commission reasoned that a tax return must be based upon actual operating expenses incurred during the test year and that normalized operating expenses, which may be relevant to a determination of a rate base figure, are not relevant to a computation of income taxes. The Commission was correct. However, Delaware contends in its brief at page 22:

"* * * Obviously Mr. McLean (and the Commission in using his theory) computed the income tax for 1961 and not for future rates, and such a computation is wholly without merit in this proceeding."

It is the amount of income tax actually paid or payable during the test year which is deductible as an operating expense. In *re Diamond State Telephone Co.*, 1 Storey 525, 149 A.2d 324 (1959). Taxes computed on future rates are neither ascertainable nor relevant.

Wilmington also contends that the Commission incorrectly computed its income taxes for the test year. In computing these taxes, the Commission deducted the amount of $81,964.00, as interest on debt, from the operating revenues of 1961. In its exhibits, Wilmington

asserted that $68,272.00 was the correct amount of interest on debt.

Wilmington's balance sheet shows a figure of $1,732,300.00 as advances from associated companies, which is a combination of $1,578,400.00 on Wilmington's books and $153,900.00 on Arden's books, non-interest bearing notes. It was estimated that at some time in the future, Wilmington would purchase Arden at a cost of $165,000.00. Wilmington capitalized its properties at the figure of $2,170,752.91, by adding the debt of Wilmington, the expected debt upon the purchase of Arden, and the equity upon Wilmington's books. For the purposes of a capitalization structure, Wilmington used the figure of $2,170,752.91 and, by taking 60% of this figure, obtained a debt for the test year of $1,303,400.00. By applying an interest rate of 5.238% to the debt figure, Wilmington contended its interest on indebtedness to be $68,272.00.

However, Wilmington debt figure of $1,303,400.00 is a purely hypothetical debt. The Commission, on the other hand, computed the average debt during the test year to be $1,564,800.00. The interest rate of 5.238% was applied to $1,564,800.00 to obtain an interest on indebtedness figure of $81,964.00. The Commission contended this was Wilmington's interest on indebtedness.

Wilmington, in this instance, created a hypothetical public utility company and a hypothetical capitalization structure which resulted in a fictional debt and a fictional interest figure. The Commission's figures appear to be more correct but the basis for the computation of the so-called average debt of Wilmington does not appear in the record or exhibits and so is not known to the Court. However, the federal law is clear. Only the interest on indebtedness actually paid may be deducted from operating revenues in determining taxable income. The Commission should determine the amount of interest actually paid by Wilmington in 1961. See *General Telephone Co. v. Public Utilities Commission,* 174 Ohio St. 575, 191 N.E.2d 341 (1963).

The matter is remanded to the Commission for further proceedings not inconsistent with this opinion.